# James, Appellant, *v.* West Chester Borough.

*Waters—Boroughs—Appropriation of water—Damages—Viewers.*

Damages occasioned by the taking of water to supply a municipality are to be estimated as of the time of the taking, and are to include the amount of water, the right to divert which is taken, irrespective of the amount actually diverted.

Where a borough council adopts a resolution appropriating an entire stream, but by a supplemental resolution limits the amount of water to be taken per day not to exceed a stated number of gallons, and five years thereafter a lower riparian owner whose property had been injured by the diversion of water, files a petition for the appointment of viewers, the jury in determining the damages must limit their consideration of the question to how much the property was reduced in value by reason of the appropriation and withdrawal from the stream of the number of gallons specified in the supplemental resolution.

*Damages—Unreasonable demand.*

In such a case if the petitioning landowner made an exorbitant and unreasonable demand, so that reasonable settlement with him was impossible, the court may properly instruct the jury that the damages should not be increased because of delay in the settlement.

Where a borough makes two successive appropriations of water from the same stream, a lower riparian owner who acquired title after the first appropriation, will be entitled to no damages therefor, but will be restricted to the damages resulting from the second appropriation.

Argued Feb. 4, 1908. Appeal, No. 375, Jan. T., 1907, by plaintiff, from judgment of C. P. Montgomery Co., March T., 1907, No. 42, on verdict for plaintiff in case of John W. James

*v.* West Chester Borough.   Before FELL, BROWN, MESTREZAT, POTTER and STEWART, JJ.   Affirmed.

Appeal from report of viewers.   Before WEAND, J.
The facts are stated in the opinion of the Supreme Court.

The court charged in part as follows:

[The borough of West Chester, without legislative author-ity, had no right to go beyond its limits to obtain water until the years 1838 and 1839, when there was enacted an act of assembly which gave them that permission.   In consequence of that act, in 1854, they resolved to build a pumping station at Fern Hill, from which to take the water of Chester creek. That pumping station was established, therefore, we will say, in 1854.

Under the act of 1838, under which the court rules that the Fern Hill station was established, there was a certain course of procedure laid down, which anyone who was in-jured was bound to pursue when he asked for damages.   This plaintiff in this suit has not pursued the procedure under that act, and therefore it is that the court has ruled that for any damage done under the taking by virtue of the act of 1838, at Fern Hill, there can be no recovery in this case.   In 1887 the legislature passed a general law applicable to all boroughs, which allowed them to go beyond their limits for the purpose of procuring water, and in pursuance of that act the defend-ant borough established another pumping station at Milltown, and it is for the damages which the plaintiff says he incurred by reason of this taking that this suit is brought.

Therefore, in considering this question, you will always recall that in mind, what we are deciding here, is what dam-age was caused to this plaintiff by reason of the taking at the Milltown station.] [2]

. [Probably the best evidence of the condition of the mill prior to 1897 would be that of the plaintiff and the men who worked in the mill at that period.   In order to determine what the difference in loss was, it is necessary to know ex-actly what was the condition of this property in 1897.   The plaintiff himself has testified on that point, and we turn to his testimony.   He says: " I realized the loss in my water-

power in 1895. Those two years I spoke of I was dreadfully handicapped, and had serious loss from the fact of not being able to run the mill." It is admitted, I believe, that up to 1895 there was no perceptible loss of water-power. "In 1895 and 1896 we were suffering a great deal of loss from not having sufficient power to operate the mills, not even enough in 1895 and 1896 to operate the flour mill alone half time in dry seasons. We were losing by having to go into the market to buy flour with which to supply the contracts," and so forth. Again : "We were able to run up to 1895 ; 1895 the night miller and also the day miller were both losing time during that time." He had previously said : "The water was noticeably decreasing from 1883, along there. We noticed the decrease in water and knew the cause, and yet we had sufficient to run the mill, but we foresaw the increased consumption or taking of West Chester was going to ruin the power." The question was asked : "Tell us in 1897 how you found the water for running your mill before you put a gasoline engine in at all. A. We had not water sufficient to run the flour mill more than half time a great deal of the time ; sometimes a little more," and so forth. "The sawmill was standing a good part of that time, only when there was a wet day, or something of that kind. In 1896 or 1897 we partially abandoned that, but we allowed the logs to come to the mill and saw them up as we could." Again : "From 1895 to 1903 there was a great deal of the time that the flour mill would not make twelve hours out of the twenty-four, with the mill not running in the summer seasons, and a great deal of the time in winter time. I was away from the place a great deal." Here he said : "Q. How many hours are you able to run your mill ? A. It is a varying thing. From six hours out of the twenty-four to probably twelve ; it depends on the season, and on the summers in ordinary stages, you could not hardly do that. There are times you can run full."

Now here, gentlemen, you have the condition of this mill up to 1897. In that year, if I am correct, he put in a gasoline engine, this for the purpose of restoring part of his power, showing in addition that he had sustained a loss of power up to that time. On this question the defendants have introduced the testimony of a witness named Brinton, who testi-

fied that in a conversation with the plaintiff he was told that the reason for putting in that gasoline engine was on account of the drought and the flood. This conversation is denied by the plaintiff, who says that he never made any statement of that kind.

In 1897 the new taking took place under which the defendants are allowed to take 1,250,000 gallons of water away. Consider how much additional damage will be done as effected by this additional right to take. Has experience demonstrated any material damage to this power measured by what has been taken since 1897? According to Mercer, who was the engineer for the defendant company for the years commencing 1895 to 1900, the highest quantity taken, as I have it, was 716,933, but he testified that during the period of nine years and six months, if I am not mistaken, the pumping at Milltown was only for 121 days. During the rest of the period covered by these years the loss, according to the testimony, was the same as in 1897 or after. The question for you then is to decide how did the damage that had already taken place at Milltown affect this property. If, during the balance of the period, exclusive of the 121 days, the pumping was all done from Fern Hill, you would have to say, in the best manner possible, how this mill was damaged any more after 1897 up to this time than it was before, remembering that up to this time the defendants have not yet taken 1,250,000 gallons daily.

This evidence that I referred to, of its previous condition, and the pumping during these nine years and six months, is important as throwing light upon the question as to whether the plaintiff's loss to date is in any way chargeable to the Milltown plant. But even if that has shown no loss, you are still to remember that the defendants are entitled to take 1,250,000 gallons. Therefore, although no appreciable loss of power can be attributed to Milltown with the quantity already taken, yet, with the right to take the whole 1,250,000 gallons, if the value of the property is diminished, plaintiff is entitled to recover whatever that may be, as measured by the difference in market value before and after 1807.] [3]

[Whatever damage was done to the predecessor of the plaintiff, or the other mill owners along that stream, is not to be

chargeable to the defendant, and has nothing to do with this case. In this case you are not to punish the defendant for anything it has done, because it has taken it by lawful means. What the plaintiff, however, is entitled to here, is full compensation for his loss, and that compensation is the difference in market value immediately before the taking of the Milltown plant in 1897, and afterwards, what it would fairly bring in an open market.] [4]

[In 1889 it is stated that this property had a fair public sale, and only brought $15,000, and the question is propounded to you, why should it have increased to such an extent up to 1897, when, from 1895 on, the power was decreasing day by day, and the effective power of that mill had been reduced in the proportion testified to by the plaintiff himself, and his witnesses.] [5]

Defendant presented these points :

1. By the Act of April 16, 1838, P. L. 477, as amended by the Act of March 23, 1839, P. L. 129, the appropriation by the borough of West Chester, of Chester creek, at Fern Hill, in 1854, entitled it, all times thereafter, to take all the water for its lawful purposes at that point. *Answer :* Affirmed with this qualification : The right to take all must be manifested in some definite manner other than the taking of an undefined quantity, and there is no evidence in this case that defendants appropriated the entire stream. [6]

2. The appropriation of Chester creek by the borough of West Chester, at Fern Hill, in 1854, was a lawful appropriation, which entitled the owner of plaintiff's premises, if injured, to damages, which are presumed to have been settled for, more than twenty-one years having elapsed since said taking. *Answer :* This is true, for the purpose of this case, as we have restricted plaintiff to damages incurred after 1897. In a proper proceeding the presumption of payment could be rebutted by evidence that the damages were not paid, where the taking is under the right of eminent domain. [7]

3. Any damage done plaintiff's property at the time of the appropriation at Fern Hill in 1854, present or prospective, did not run as a covenant with the title, and did not pass to the respective future purchasers of the property. *Answer :* This is affirmed. [8]

4. In the present proceeding the plaintiff is entitled to no damages for the taking of water by defendant at Fern Hill for its lawful purposes under its appropriation in 1854, and as against this plaintiff, defendant is entitled to take all the water it needs at Fern Hill up to 1,250,000 gallons each twenty-four hours, if Fern Hill is capable of producing that quantity. *Answer :* Affirmed, with the qualification, that for damages incurred under the appropriation of the water by the borough in 1854, plaintiff cannot recover in this action ; but he can recover for the damages done by the difference in quantity actually appropriated in 1854, and 1,250,000 gallons. This point is further answered by the answer to the next point. [9]

5. Recovery in this proceeding is based on the taking by defendant under its resolution of April 9, 1897, August 31, 1899, and October 19, 1900, whereby it appropriated the waters of Chester creek and limited the taking to 1,250,000 gallons of water at Fern Hill and Milltown each twenty-four hours, and the difference between what the jury may find under the weight of the testimony, as the number of gallons of water capable of being taken at Fern Hill and 1,250,000 gallons each twenty-four hours, less such part of the difference as is returned, so far as it affects the market value of plaintiff's property, is the sole basis upon which damages are to be determined. *Answer :* Affirmed, by adding to the words " capable of being taken at Fern Hill," the words under its ordinance and taking in 1854. [10]

6. Plaintiff is only entitled to recover the difference in the market value of his property as affected by the appropriations of 1897 and 1899 as limited in 1900, and the inquiry is confined to the fair market value of his property immediately before said taking, and its market value immediately after said taking. *Answer :* This is affirmed. [11]

13. Whatever sum the jury may find to represent the depreciation of the market value of plaintiff's property solely due to the taking by defendant, the plaintiff is not entitled to receive interest thereon ; nor is he entitled to have the damages further increased because of the delay in settlement, if the jury find his demand was so exorbitant and unreasonable as to make payment of his reasonable damages impossible. *Answer :* This is affirmed. [12]

*Thomas W. Pierce*, with him *George E. Darlington* and *Louis M. Childs*, for appellant.—Damages occasioned by the exercise of a statutory power with a statutory remedy similar to the acts of 1838, 1839, were held recoverable in a proceeding under the act of 1887: Shroder et al. v. Lancaster, 170 Pa. 136.

Damages for successive increasing takings occurring within a period of twenty-one years can be recovered in one proceeding: Hannum v. Borough of West Chester, 63 Pa. 475.

This court has said when the special act of 1838, in relation to West Chester, was before it, that the legislature meant that instead of successive actions on the case there should be but one proceeding, the judgment in which should be in effect a transfer to the borough of all the party's rights to the water of the creek, which might be needed for the purposes in contemplation: Hannum v. Borough of West Chester, 63 Pa. 475.

Where a water company as a riparian owner diverts water to the injury of a lower riparian owner, the proper basis of estimating the damages is the average condition of the stream for a number of years, not by its condition in an extremely dry one: Philipsburg Water Co. v. Citizens' Water Co., 25 Pa. C. C. Rep. 382.

*E. H. Hall* and *N. H. Larzelere*, with them *Wm. S. Windle* and *W. W. MacElree*, for appellee.

OPINION BY MR. JUSTICE POTTER, March 30, 1908:

This was an appeal from the report of viewers appointed to assess damages sustained by plaintiff through the appropriation of the waters of Chester creek by the defendant for the purpose of improving and enlarging its water supply. The proceedings were instituted in Chester county, but under a change of venue to Montgomery county, the issue framed under the appeal was there tried, resulting in a verdict in favor of plaintiff for $2,800, upon which judgment was entered. Plaintiff has appealed.

It appears from the evidence that in the year 1854, the borough of West Chester obtained title by condemnation to a piece of land at Fern Hill on Chester creek, and erected there a pumping station on the banks of the stream. It has con-

tinued the use of this plant and has drawn water from Chester creek at this point from that time until the present. In the year 1897, the borough authorities purchased a mill and water power located at Milltown on Chester creek several miles below Fern Hill, and erected there a pumping station and reservoir, and since then have pumped water from time to time from the stream at that point to the reservoir near Fern Hill, from whence the water is distributed to the town.

The plaintiff, John W. James, is the owner of a tract of about eighty acres of land situated on Chester creek, below both of the pumping stations of the borough of West Chester. Upon his land are located two mills on opposite banks of the stream, one a flour mill, and the other a feed and sawmill. He acquired title to the property in 1889, and shortly afterwards sold a one-half interest therein, which was conveyed back to him in 1895. Since that time he has continued to hold title to the entire tract of land, and has operated the mills. The plaintiff did not allege any impairment of his water supply prior to 1895, and it appears from the evidence that the years 1895 and 1896 were seasons of unusually low rainfall. But since 1897, when the Milltown pumping station was erected, its operation has resulted in an impairment of the plaintiff's water power.

The proceedings in this case were under the provisions of the Act of May 25, 1887, P. L. 267. The actual taking of the water at Milltown began in 1897. No bond was filed and no formal appropriation was made until August 31, 1899, when the original resolution was adopted by the borough council appropriating the entire stream. On October 19, 1900, a supplemental resolution was adopted, which modified the prior resolution in respect to the amount of water to be taken from Chester creek and limited the amount, so that it should not exceed 1,250,000 gallons in any day of twenty-four hours. The plaintiff's right to recover damages, however, rests upon the actual taking in 1897, and not upon either the original or the supplemental resolution of appropriation. It was not shown, however, that at any time more than 1,250,000 gallons per day were actually taken.

The petition for the appointment of viewers in the present case was not filed until August 28, 1905, nearly five years af-

ter the adoption of the supplemental resolution. If there was any restriction placed upon the appropriation of water, it was proper to consider it, in assessing the damages. This principle is inferentially recognized in Miller v. Water Company, 148 Pa. 429; and it is very clearly stated in Lee v. Water Company, 176 Pa. 223. In that case the water company limited its appropriation of water to 2,000,000 gallons each day, and Justice WILLIAMS said (p. 227): "The attention of the jury should have been drawn strictly to the question, how much has this property been reduced in value by reason of the appropriation and withdrawal from the stream of the 2,000,000 gallons of water? Anything tending to obscure, or divert attention from, this well settled measure of damages should have been avoided."

In the present case, as the second resolution limited the right of the defendant to 1,250,000 gallons daily, and the charge of the court limited the damages to the withdrawal of that amount, the ruling was squarely within the principle laid down in Lee v. Water Co., 176 Pa. 223.

Counsel for appellant complains of the trial judge for confining the jury in the assessment of damages, to the taking of the water at Milltown, and excluding the taking at Fern Hill. We think the trial judge was clearly right in so doing. The taking at Fern Hill was before appellant had any title to the property in question. It is settled in Pennsylvania, as stated in the opinion in Losch's Appeal, 109 Pa. 72, that " damages being in the nature of a trespass for injury done to the land, do not pass by a subsequent conveyance thereof. The damages were a personal claim of the owner when the injury occurred. They do not run with the land nor pass by the deed, although not specifically reserved." To the same effect are Warrell v. Wheeling, etc., R. R., 130 Pa. 600; Tenbrooke v. Jahke, 77 Pa. 392; McFadden v. Johnson, 72 Pa. 335. In Hannum v. Borough of West Chester, 63 Pa. 475, Justice SHARSWOOD said that under the special acts of 1838 and 1839, authorizing the borough of West Chester to procure a supply of water, there " should be but one proceeding; the judgment in which should be in effect a transfer to the borough of all his right to the waters of the creek, which might be needed for the purposes in contemplation."

It is clear, therefore, that, under the application of this principle, appellant had no right to recover for any damages at Fern Hill, as the appropriation there occurred long before his tittle was acquired.

In addition we might add, that there seems to be no evidence to show any damage to his water supply from any taking at Fern Hill.

The rule is apparently well established that damages occasioned by the taking of water to supply a city, are to be estimated as of the time of the taking, and are to include the amount of water, the right to divert which is taken, irrespective of the amount actually diverted : Gould on Waters (3d ed.), p. 495. In his twelfth assignment of error, appellant complains of the affirmance of defendant's thirteenth point for charge, by which the jury were instructed that plaintiff would not be entitled to have his damages increased because of delay in settlement, " if the jury find his demand was so exorbitant and unreasonable as to make payment of his reasonable damages impossible." No fault can be found with this instruction as a sound proposition of law. The evidence showed that in the action of trespass brought in 1904 by appellant against the defendant, he laid his damages at the sum of $20,000, and in the testimony in the present case the same amount is claimed. The jury found the actual damages to have been $2,800. Such a discrepancy might well be deemed sufficient to warrant the jury in refusing to allow any additional sum for the delay in making settlement.

The assignments of error are overruled and the judgment is affirmed.