George ELWOOD, Administrator of the Estate of Beatrice A. Van Loan, Plaintiff,

v.

The CITY OF NEW YORK, Defendant.

George K. GREGORY and Helen Gregory, Plaintiffs,

v.

The CITY OF NEW YORK, Defendant.

Lillian J. BADGLEY, Plaintiff,

v.

The CITY OF NEW YORK, Defendant.

Emil LAKE and Helen Lake, Plaintiffs,

v.

The CITY OF NEW YORK, Defendant.

Lloyd F. CANFIELD and Eloise L. Canfield, Plaintiffs,

v.

The CITY OF NEW YORK, Defendant.

Nos. 62 Civ. 2562–CLB, 66 Civ. 2150–CLB, 66 Civ. 2152–CLB, 66 Civ. 2154–CLB and 71 Civ. 5568–CLB.

United States District Court, S. D. New York.

March 31, 1978.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, Herman E. Gottfried, Margaretville, N. Y., Jack Weinberg, New York City, for plaintiffs Canfield.

Kalter & Gottlieb, Michael R. Gottlieb, Woodbourne, N. Y., for plaintiffs Gregory, Badgley, Lake and Elwood.

Allen G. Schwartz, Corp. Counsel, Paul T. Gorman, Asst. Corp. Counsel, Binghamton, N. Y., William P. Murray, Asst. Corp. Counsel, Kingston, N. Y., for defendant City of New York.

### FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

These five actions, consolidated for trial, have been brought by, or in the name of, owners of riparian land situated in Pennsylvania, who claim that the value of their lands along the Delaware River and its West Branch was diminished by the City of New York's diversion of the headwaters of the Delaware River for public water supply purposes.

The Court has subject matter jurisdiction based upon diversity of citizenship of the parties at the dates of commencement of the actions, pursuant to 28 U.S.C. § 1332(a)(1). Trial was before the Court

without a jury, commencing on June 2, 1975. Post-trial briefs, memoranda and submissions of the parties have been read and considered.

*The Delaware River*

An understanding of the location, design and operation of that portion of the New York City water supply system drawn from the Delaware River is essential to an understanding of this litigation. The Delaware is one of the major rivers on the Atlantic seaboard. From its sources in New York State to Delaware Bay, the River runs 410 miles, and drains a watershed of some 12,765 square miles. The Delaware River has two main branches, the East Branch and the West Branch. The West Branch rises north of Stamford, New York in Delaware County. The East Branch has its origin near Margaretville, New York. On its way to the sea, the Delaware River is joined by many streams and tributaries.

The two branches join at Hancock, New York. Thereafter, the River flows in a generally southeasterly direction. Commencing near Deposit, New York, the West Branch forms the boundary line between New York and Pennsylvania. At Tri-State Rock, near Port Jervis, New York, the boundaries of New Jersey, New York and Pennsylvania converge. Below Tri-State Rock, the River constitutes the boundary between New Jersey and Pennsylvania. The Lehigh River joins the Delaware near Easton, Pennsylvania. At the head of Delaware Bay near Wilmington, Delaware, it discharges into the Atlantic Ocean.

Pursuant to proceedings in the Supreme Court, discussed below, the City of New York constructed Pepacton Reservoir, on the East Branch of the Delaware near Downsville, New York. This, and all of the City's reservoirs discussed herein are located entirely in New York State. No part of New York City is located in the drainage basin of the Delaware or any of its tributaries.

Impoundment of water behind the dam erected to create the Pepacton Reservoir began in September 1954; the first diversion to New York City occurred in January 1955; and the dam spilled for the first time on April 16, 1956. Pepacton Reservoir is 180 feet deep at its deepest point, and has a capacity of some 147 billion gallons. The drainage area impounded by Pepacton is 371 square miles.

Thereafter, the City constructed Cannonsville Reservoir, on the West Branch of the Delaware near Stilesville, New York. Impoundment at the Cannonsville Reservoir began in September 1963; the first diversion to New York City occurred in January 1964; and that dam first spilled on May 9, 1967. The Cannonsville Reservoir has a maximum depth of 150 feet and a capacity of 97.4 billion gallons. The drainage area impounded by Cannonsville is 450 square miles. On the Neversink River, a tributary of the Delaware, the City also has the older and smaller Neversink Reservoir, impounding a drainage area of 92 square miles and having a maximum storage capacity of 37.1 billion gallons.

The premises of the plaintiffs described below, are all, except for Van Loan, located downstream of the confluence of the West Branch and East Branch of the Delaware, and above the point where the Neversink River enters the Delaware. The Van Loan property is situated upstream from Hancock, near Ball's Eddy, New York, and is affected only by operation of the Cannonsville Reservoir.

Water flows in the Delaware River are affected by the impoundment activities of third parties. Lake Wallenpaupack in Pennsylvania has been dammed by a hydroelectric generating station. It contains a drainage area of 228 square miles, and discharges into the Delaware through the Lackawaxen River at a point upstream from Barryville, New York, and also upstream from the Montague, New Jersey gauging station, mentioned below. As electric demand varies, the amount of impounded water being released increases or decreases. A similar project on the Mongaup River in New York has a similar effect. The Mongaup also joins the Delaware above Montague, New Jersey.

All plaintiffs are located upstream from the Lackawaxen, Mongaup and Neversink Rivers. Streamflow in the Delaware at their parcels is not augmented when water is released downstream by the City from the Neversink Reservoir, or by the generation of electric power by unrelated persons on the Lackawaxen and the Mongaup.

The function of the three City reservoirs mentioned above is to impound spring runoff, store it during periods of little or no rainfall, and divert the stored water from the watershed of the Delaware to the Hudson River Valley by means of the Delaware Aqueduct System. The water is used by the City of New York, and, to a minimal extent, also by other New York communities situated along the course of the Aqueduct. After use, it is discharged into drainage basins other than that of the Delaware River, generally the Hudson River and New York Bay.

The term "diversion" is neutral in the law. It can indicate the perfectly proper "ordinary and domestic uses," *York Haven Water & Power Co. v. York Haven Paper Co.,* 201 F. 270, 275 (3d Cir. 1912), to which every riparian owner can turn the waters of a stream flowing through or at the boundary of his land, so long as he returns the residue to the stream within the boundaries of his land. *See Mayor v. Commissioners,* 7 Pa. 348, 367–68 (1847). To be lawful, such uses need only be reasonable. Where, however, a riparian owner's uses of the waters of a stream unreasonably deprive a downstream riparian owner of the value of his location, *see, Williams v. Fulmer,* 151 Pa. 405, 414, 25 A. 103 (1892), by changing the channel, direction, flow, stage, quality, etc., of the stream—all of which are summed up in the common law phrase *"currere solebat,"*—the diversion invades a valuable property right of a downstream owner and is actionable. *See, United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 702, 19 S.Ct. 770, 43 L.Ed. 1136 (1899); *Hackensack Water Co. v. Village of Nyack,* 289 F.Supp. 671 (S.D.N.Y.1968). The permanent massive diversion of water out of a channel for uses outside the drainage area and unconnected with the ownership and use of riparian land, as, for example, to add to the water supply of a community that is not within the drainage area of the stream, is unreasonable. *See e. g., Standard Plate Glass Co. v. Butler Water Co.,* 5 Pa.Super. 563 (1897).

At the present time, New York City relies on three principal sources to meet its water supply needs. The two older sources are the Croton System, on the Croton, Bronx and Byram Rivers, and the Catskill System, on Esopus Creek and Schoharie Creek. The Delaware System, comprising the reservoirs on the East and West Branches and on the Neversink River, is the City's most recent source of supply and provides fully 50% of the City's needs. Since in years of normal rainfall the available water exceeds requirements, the City can and does draw at varying times greater or lesser amounts from its different sources, having regard to operating costs, pending maintenance and repair projects, comparable quality, tastes and odors, and related operating criteria. Because of its larger size, and the relatively smaller human population and industrial activity in the watershed area, Delaware water is regarded as the best quality water presently available from the various City sources. New York chlorinates its supply but has not yet found it necessary to filter or otherwise treat its water, as do most communities.

*The Parties and Their Properties*

The lands of four of the plaintiffs here are located on the Pennsylvania side of the main body of the Delaware River between Hancock, New York and Narrowsburg, New York. The property of one of the plaintiffs, Van Loan/Elwood, is located on the Pennsylvania side of the West Branch, above Hancock, New York near Ball's Eddy. All are located upstream from Montague, New Jersey, and upstream from the points where the Lackawaxen, Mongaup and Neversink Rivers join the Delaware.

(1) *Van Loan/Elwood.* Mrs. Beatrice Van Loan was the first of these plaintiffs to commence action against the City. Con-

sequently, the procedural history of her action is the most complex.

Mrs. Van Loan owned 124 acres of land with approximately one-half mile frontage on the West Branch of the Delaware, about five miles above the confluence of the East and West Branches at Hancock, New York. Hers is the only property not located on the main body of the Delaware. She bought the property in 1922, and operated a dairy farm at the time of her death.

On July 23, 1962, she filed her original complaint seeking to enjoin construction of the Cannonsville Reservoir, then being built some 10 miles upstream from her property. She alleged that since no express statutory provision had been made by New York State to compensate Pennsylvania riparians for the City's damage to riverfront property, the City's action constituted a "taking" without compensation.

By a Memorandum Opinion dated November 14, 1963, the late Judge McLean of this Court dismissed Van Loan's complaint as premature, since the Cannonsville Dam had not yet been completed and would, when complete, cause no injury for which money damages would not be adequate compensation. Judge McLean granted leave to amend the complaint when the dam was completed.[1]

Mrs. Van Loan died testate in May 1965. By a Memorandum Decision dated May 31, 1966, Judge Wyatt of this Court allowed the filing of an amended complaint by George Elwood, the ancillary administrator d.b.n., c.t.a. of Mrs. Van Loan's Estate, who had been appointed after the resignation of the named executor. The amended complaint was filed on May 4, 1966.

On November 12, 1966, the administrator sold the Van Loan property at auction for $15,200.00. Title was conveyed on February 23, 1967. The administrator's deed expressly reserved all rights against the City of New York, for past or future damages or the taking. The Deed (Ex. 39) reads in relevant part as follows:

"ALSO EXCEPTING AND RESERVING unto the seller, the heirs, legatees and devisees of the Beatrice VanLoan Estate or their assigns, a claim or claims against the City of New York arising out of and by reason of rights heretofore acquired and to be acquired in connection with the past and future diversion of the West Branch of the Delaware River which has already and will cause a decrease in the market value of the real estate being sold, and for business damages heretofore incurred, and all aspects thereof."

For a discussion of the effect of this Reservation of rights see text *infra*, pp. 872–873.

On August 7, 1967, Judge Bonsal of this Court denied cross-motions for summary judgment in the Van Loan/Elwood action, holding that apparent disputed factual issues were present. *Elwood v. City of New York*, 271 F.Supp. 62 (S.D.N.Y.1967).

By a Memorandum Decision dated March 27, 1973, Judge Pierce of this Court dismissed the Elwood complaint for failure to allege the filing of a Notice of Claim pursuant to New York General Municipal Law §§ 50–e and 50–i. However, in light of plaintiff's claim of a continuing trespass, leave to amend the complaint on filing of a Notice of Claim was granted. The Court noted that "the initial period of the claim would be limited by this late filing to encompass trespass only up to 90 days before the notice of claim was filed," citing *Hackensack Water Co. v. Village of Nyack*, 289 F.Supp. 671 (S.D.N.Y.1968).

---

1. In his decision, Judge McLean specifically rejected the City's defense that the *Van Loan* action was barred by the Supreme Court's decision in *New Jersey v. New York*, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954), discussed in the text, pp. 855–858:

"[T]hat action, it is true, involved the right of New York to divert waters of the Delaware River by the construction of dams and reservoirs, including the Cannonsville Reservoir, but the action did not involve the rights of individual property owners, and the Supreme Court's decree did not touch that question or purport to. exclude it from consideration by the District Court in a proper case." *Id.* at 4.

Elwood filed his Notice of Claim on April 24, 1973, and on June 11, 1973 filed his amended complaint.

(2) *Badgley.* Mrs. Lillian Badgley commenced her action against the City on July 15, 1966. In 1958 she and her husband had purchased approximately two acres of land with 530 feet of River frontage on the main body of the Delaware River just above the *Lake* parcel. They paid $22,500.00 for the property and she claims to have made some $40,000.00 worth of improvements on the property in order to make it into a resort. Her husband, Foster Badgley, died in 1965, and as a result, title vested in her. She has since remarried, to one Dixon, but retains title to the property in her prior name.

Mrs. Dixon filed her Notice of Claim against the City on May 24, 1972.

On March 22, 1973, on the City's motion in *Lake, Badgley* and in a third case, *Duryea Pine Flats Hunting Lodge,* 66 Civ. 2151, which is no longer pending,[2] this Court issued a Memorandum Decision dismissing the complaints with leave to amend the complaints to include proper allegations of filing the required Notices of Claim.

That decision held that, although the plaintiffs could not avail themselves of Title K of the Administrative Code of the City of New York,[3] and although, for the

reasons therein stated, they had suffered no extraterritorial "taking" of their Pennsylvania property by the City of New York, they were entitled to pursue their actions for a continuing trespass, and to recover "damages not only to the date of judgment, but for anticipated future injury to the property during the foreseeable life of the diversion works, or in perpetuity." *Id.* at 4.

Decision was reserved on the question whether, under Pennsylvania law, "one who conveys title may reserve to himself [in his deed of conveyance] the right to assert a claim for a permanent continuing trespass *in futuro,*" but I rejected the City's defenses based on the interstate allocation of the waters of the Delaware River:

"Nothing is found in *New Jersey v. New York,* 347 U.S. 995 [74 S.Ct. 842, 98 L.Ed. 1127] (1954), or in the Delaware River Basin Compact, as approved in Pub.Law 87–328, or in any Pennsylvania statute enacted pursuant thereto, which implies otherwise." *Id.* at 10.

An amended complaint in *Badgley* was filed thereafter, on April 25, 1973.

(3) *Lake.* Emil and Helen Lake filed their complaint against the City on July 15, 1966. At that time they owned some 15 acres, bought in 1945 and 1951 for approximately $4,200.00, with 600 feet of frontage

---

**2.** Another case involving Pennsylvania riparian land on the Delaware River situated similarly to the lands of the plaintiffs here and in which similar claims were pleaded has been tried. In a Decision dated August 1, 1972, Judge Bonsal held that the plaintiff in *Dempsey v. City of New York,* 66 Civ. 2153, had failed to prove his case. Dempsey was proceeding *pro se* on the theory that he had failed to re-open his resort hotel on the Delaware River because of the City's diversion of the River. The Court held at p. 5 of its Decision that:

"[a] careful review of the evidence satisfies the court that the plaintiff's uncorroborated testimony has failed to prove by a fair preponderance of the evidence that he was unable to use his property as a hotel and restaurant because of the diversion of water by the City. This disposition makes it unnecessary to consider the several defenses interposed by the City."

**3.** Title K, Chapter 51 of the Administrative Code of the City of New York, known as the Water Supply Act, created a Board, consisting

of four Commissioners, to supervise and ensure the City's continued supply of fresh water. The Act provides for compensation to be paid land owners in New York whose property is taken outright for reservoir and associated purposes (K51–11.0). It also provides for compensation for owners whose property is "directly or indirectly decreased in value" (K51–44.0), as a result of the City's efforts to obtain water. Under this latter provision, substantial awards have been paid to riparians on the Neversink and Delaware Rivers, among others. *See, e. g., In re Maguire (Wingert),* 48 A.D.2d 958, 370 N.Y.S.2d 680 (3d Dept.1975), *leave to appeal denied,* 37 N.Y.2d 712, 380 N.Y.S.2d 1025, 343 N.E.2d 289 (1976); *In re Ford,* 35 A.D.2d 626, 313 N.Y.S.2d 42 (3d Dept.1970); *In re Ford (Luth),* 18 A.D.2d 855, 236 N.Y.S.2d 591 (3d Dept.1963). In *Gregory v. City of New York,* 346 F.Supp. 140 (S.D.N.Y.1972), this Court held that procedures under Title K were not available to riparians situated outside of New York State.

on the main body of the Delaware just upstream from the *Gregory* parcel, described below.

On September 27, 1968 the Lakes sold their property for $18,500.00. By recital essentially the same as that found in the Elwood/Van Loan deed, they reserved all rights against the City of New York.

On May 23, 1972, alerted by the pending City motion to dismiss in *Gregory v. City of New York, supra,* the Lakes filed the Notice of Claim required by the General Municipal Law, and amended their complaint on April 4, 1973.

(4) *Gregory.* George and Helen Gregory commenced their action against the City of New York on July 15, 1966. They are New Jersey residents, who, in 1960, purchased 124 acres of riparian land in Pennsylvania with some 4,000 feet of frontage on the Delaware River. They paid $20,000.00 for the property, which included at the time of purchase a house, barn, sauna and four cottages. Between 1964 and the time of trial they sold some 34.5 acres of their land, including 3,323 feet of River frontage, for $48,900.00, and retained at the time of trial some 89 acres and 750 feet of frontage. The Gregory parcel is located some 39 miles downstream from the Pepacton Reservoir, and 22 miles downstream from the Cannonsville Reservoir.

In a prior decision [*Gregory v. City of New York*, 346 F.Supp. 140 (S.D.N.Y.1972)], familiarity with which is assumed, this Court held that the Water Supply Act, Title K, Chapter 51 of the Administrative Code of the City of New York, which prescribes a procedure by which owners can be compensated for the City's impairment of their riparian rights, was not available to holders of property in Pennsylvania, but that both New York and Pennsylvania law provided a cause of action to recover damages, if any, resulting from the City's continuing trespass. However, the original *Gregory* complaint was dismissed because of the plaintiffs' failure to file the Notice of Claim required by Sections 50–e and 50–i of New York's General Municipal Law. Plaintiffs were granted leave to file the Notice, and

thereafter, an amended complaint alleging a continuing trespass to their rights as riparians to the extent not time barred. On May 25, 1972, these plaintiffs filed their Notice of Claim, and on July 27, 1972, filed an amended complaint demanding $50,-000.00 damages for the City's continuing trespass.

The claims alleged in the Gregory's amended complaint are typical of those made by all plaintiffs in this consolidated action, and are as follows:

"That by reason of the aforesaid diversions of the [Delaware] river and the trespasses by the defendants herein and absence of water in said river at the plaintiff's premises downstream therefrom, and the permanence of said diversion and of said trespasses and past, present and future operation by the City of New York of said dams at Cannonsville and Downsville, and the said Pepacton and Cannonsville Reservoirs, the said river has and will become a swamp, fishing therein has [been] and will be destroyed, and the river will become oderiferous, unsightly, and will be unable to provide plaintiff's property with ground water and surface water, will decrease the fertility of said property, will make such property unsuitable for recreational purposes, all of which has and will greatly decrease the market value of the plaintiff's property and cause damage thereto by reason of the foregoing and other effects of said diversions and trespasses too numerous to mention, all to the plaintiff's damage . . . ." [¶ 9, matter in brackets added.]

(5) *Canfield.* Lloyd and Eloise Canfield filed their complaint against the City on December 22, 1971, at which time they owned 166 acres on the main body of the Delaware with about 6,700 feet of River frontage. Their Notice of Claim against the City was filed on October 20, 1971, and was properly pleaded in their complaint.

In 1954 Canfield acquired title to the property, then consisting of 278 acres, for $5,000.00 from his half brother, Grant Lee Canfield, a minor under the age of 14 years.

This was accomplished through a judicial proceeding in a Pennsylvania court in which the Wayne County Savings Bank as guardian of the Estate of Grant Lee Canfield, sold the premises to these plaintiffs for $5,000.00.[4]

The Court has visited each of the premises affected by this litigation and has made a personal inspection thereof in the presence of counsel for all parties. The price of $5,000.00 paid for the Canfield property, even in 1954, could not be, and is not regarded as reflecting an arms length sale. The price which a fully informed seller under no necessity of making a prompt sale would receive from an unrelated purchaser, in an arms length sale would be much larger.

In a Memorandum Decision dated May 11, 1972, Judge Tenney of this Court denied the City's motion to dismiss the *Canfield* action, holding that the plaintiffs had a cause of action for a continuing trespass, and that the measure of damages for such trespass was the same as that provided in Title K of the Administrative Code of the City of New York, to wit: the difference between the market value of the property with the City's diversion of the stream and the market value without such diversion.

Class action status was denied in the *Canfield* case after the decision of the Supreme Court in *Zahn v. Int'l. Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1974). The Canfields had participated unsuccessfully in the *Zahn* case as *amicus curiae* favoring plaintiff Zahn's position. They had planned to assert the interest of all downstream owners adversely affected by the diversion. Some part of the delay in the case arose while the parties awaited the resolution of the *Zahn* class action issue.

*Proceedings Affecting the Delaware River; The River Master*

Beginning in 1929, the City of New York planned the diversion of the Delaware river and its tributaries to meet the increasing municipal water supply needs of the City, and other municipalities dependent on the City for all or part of such supply.

To restrain this proposed diversion, the State of New Jersey began an original suit in the Supreme Court against the State of New York and the City. Pennsylvania intervened to protect its own sovereign interests in the Delaware River. *New Jersey v. New York*, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931).

The Supreme Court found the River and its tributaries "a necessity of life [to] be rationed among those who have power over it," *id.* at 342, 51 S.Ct. at 479, and applied the federal common law doctrine of equitable apportionment, to allow the City to divert from the Delaware watershed up to 440 million gallons of water a day, provided certain stream management conditions were met. Principal among these was the requirement that a sewage treatment plant be constructed at Port Jervis, New York, to lessen the accumulated pollution present in the diminished downstream flow of the River. A constantly maintained flow of .50 c. s. m. (1,535 c. f. s.) was also required to be maintained at Montague, New Jersey, just below Port Jervis.

The Supreme Court retained continuing jurisdiction over its equitable decree in order to adjust the rights of the parties as equity might require in the future. The Court explicitly held that the diversion should "not constitute a prior appropriation, and shall not give the State of New York and City of New York any superiority of right over the State of New Jersey and Commonwealth of Pennsylvania in the enjoyment and use of the Delaware River and its tributaries." *Id.* at 347, 51 S.Ct. at 481.

Until 1953, when the Neversink Reservoir was completed, the City did not avail itself of its right under this decree to withdraw 440 m. g. d. from the Delaware and its tributaries. The Neversink is tributary to

---

4. The deed of conveyance, Ex. 48, recites that "the petitioner (Wayne County Savings Bank) believed the sum a full and fair price for the said premises and more than could be realized at a public sale; that the petitioner believed it to be to the interests and advantage of the said minor that the said premises be sold for the price above mentioned."

the Delaware at a point downstream from the properties which are the subject of this suit. These plaintiffs were not affected by the diversion of water from the Neversink. Those waterworks are involved here only insofar as releases from Neversink Reservoir form one element contributing to the combined minimum flow that must be maintained at Montague, New Jersey under the Supreme Court's revised Decree of 1954. For a discussion of compensation of riparians on the Neversink River, see *In re Ford (Whitton)*, 35 A.D.2d 626, 313 N.Y.S.2d 42 (3d Dept. 1970). All such properties are in New York State.

In 1952, the City, with the approval and support of New York State, petitioned the Supreme Court for a modification of the 1931 Decree which would allow additional diversions of water from the Delaware by means of proposed dams at Cannonsville and Downsville (Pepacton) New York. The petition was allowed. *New Jersey v. New York*, 343 U.S. 974, 72 S.Ct. 1068, 96 L.Ed. 1367 (1952). A motion by the City of Philadelphia to intervene in the proceedings to protect its interests in the River was denied on the finding that its rights were "invariably served by the Commonwealth's [*i. e.*, Commonwealth of Pennsylvania's] position." 345 U.S. 369, 374, 73 S.Ct. 689, 692, 97 L.Ed. 1081 (1953).

In 1954, the Supreme Court modified and superseded its 1931 Decree. 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954). Under the terms of the new Decree, the City was allowed to continue the diversion of 440 m. g. d. from the Delaware and its tributaries until the completion of the Pepacton Reservoir then under construction on the East Branch, at which time it could begin to divert 490 m. g. d., subject to a requirement of maintaining a flow of 1,525 c. f. s. at Montague, New Jersey. After the completion of the Cannonsville Reservoir on the West Branch of the Delaware, the City was authorized to divert the full amount of 800 m. g. d. on a cumulative average basis, subject again to the requirement of maintaining a minimum flow of at least 1,750 c. f. s. at Montague, New Jersey.

In addition to the aforementioned minimum flow requirement at Montague, New Jersey, the City is also required to release an "excess release quantity" of its impounded water into the Delaware. Essentially, this is a device to enable the City gradually to adapt to increased demands for water. On the first day of each calendar year, the City is required to make an estimate of its total annual consumption of water from all sources (excluding pumping) for the next year. This estimate is based on the maximum consumption for any previous year plus an annual increment of 7.25 billion gallons. The City is then required to release over any 120 day period after the fifteenth day of June of each year, an additional amount of water into the Delaware equal to 83% of the amount by which its estimated consumption and yearly increment exceed 1,665 m. g. d. (the City's minimum "safe yield" from all sources, excluding pumping, as determined by the Supreme Court). In no calendar year is this "excess release quantity" of water so computed required to exceed 70 billion gallons, and the City is never required to maintain a flow at Montague, New Jersey greater than 2,650 c. f. s. Since 1968, as New York City's consumption has increased, this "excess release quantity" has steadily diminished. At the time of trial, the flow at Montague, New Jersey was being maintained at approximately 2,000 c. f. s.

Under the system of stream management established by the Supreme Court, any daily diversion, no matter how large, is permitted from any one or all of the three reservoirs (Pepacton, Cannonsville and Neversink) so long as the required minimum flow at Montague, New Jersey is maintained, and so long as the quotient of the total amount of water diverted that year, divided by the number of days of the year to that date, does not exceed 800 m. g. d., and so long as it satisfies the "excess release quantity" provision.

In its 1954 Decree, the Supreme Court appointed a River Master, the Chief Hydraulic Engineer of the United States Geological Survey, to oversee and implement

the Decree. It is the River Master's duty to require the City to maintain the required flow at Montague. Under the Decree, the City is not required to make any releases of impounded water unless and until the River Master calls for them. On at least one occasion, during the drought in June 1965, the City has refused to comply with the River Master's requests for increased flow.[5]

Under the provisions of the revised Decree, the Supreme Court continued to retain jurisdiction over the controversy. 347 U.S. at 1005, 74 S.Ct. 842. The City has a continuing equitable duty to develop its available sources of water to meet its increasing needs, by the construction of additional impoundment and storage facilities, and by developing those other sources, including the Hudson River, directly available to it, and can be required to do so by the Supreme Court. All parties have assumed, correctly, that in times of unusually high consumption, drought, fires or similar situations of short or long duration, the City would discharge its obligations to the public consumers of water prior to performing its duties owed under the Decree to downstream communities and riparian owners. When and how often in the future the City will refuse *ex necessitate* to comply with the River Master's requests presents a question which is primarily speculative, but plaintiffs and the Court must assume that such occasions will arise again during the existence of these Dams, as happened in 1965.

A more serious and recurring problem with this regulatory scheme from the point of view of these plaintiffs is that the River Master is unconcerned, nor is he required to be concerned, with the sources of the re-quired minimum flow at Montague. In planning how to assure the daily flow at Montague, the River Master must and does take into account the anticipated releases resulting from electric power generation on the Mongaup and the Lackawaxen (Lake Wallenpaupack), described *supra*, p. 850.

These electric generating utilities each make independent determinations as to the amount of water which will be discharged. Such determinations are based only on the economics of the electric generating activities of the utility, and the demand for power. The amounts of such discharges are unpredictable, and vary significantly from day to day. There is no provision in the Delaware River Compact or the Supreme Court's Decree by which the River Master can require the power plant operators to make any minimum release from impounded water on any particular date, in addition to that needed for power generation. Presumably, provisions authorizing any such direction would require compensation to be made to the power plant owners.[6]

Uncontradicted testimony at trial showed that the River Master has relied increasingly over the years on these power plant releases to make up the required flow at Montague. Only when the projected run-off of all upstream tributaries and the projected releases of the two power plant reservoirs are anticipated to produce less than the minimum required flow at Montague Gauging Station does the River Master call on the City for net releases from its dams. These demands, in a typical year, range from zero to as much as 1.5 billion gallons on a given day.

Once a demand has been made upon the City for releases to maintain the required

---

5. Presumably, such failure was justified by immediate and overwhelming public necessity. No penal sanctions were imposed.

6. Riparian owners maintaining the electric generating dams on the Mongaup River and at Lake Wallenpaupack on the Lackawaxen River are not engaging in unreasonable diversion in violation of the riparian rights of downstream owners. They are merely regulating the flow in the stream in an unnatural fashion, dependent on their power demands; the more electric-ity they generate at their locations during a given time period, the greater will be the amount of impounded waters released. It is ordinarily considered that the actions of the owner of a dam who makes reasonable use of the waters of a stream in the operation of saw mills, grist mills, etc., without diverting water out of the watershed, are not actionable at the instance of the downstream owner. *See, e. g., Pierson v. Speyer,* 178 N.Y. 270, 70 N.E. 799 (1904).

flow at Montague, the City is faced with a choice of three reservoirs (Cannonsville, Pepacton, Neversink) from any or all of which it may make the required releases in whole or in part.

The testimony of the City's expert witness, Mr. Paul Blomquist, former head of the Bureau of Claims of the Board of Water Supply for the City, establishes the existence of a general policy of the City to make major releases through the Cannonsville dam because of its greater release capacity (2,440 c. f. s., as compared with 760 c. f. s. from the Pepacton Reservoir).[7] On numerous occasions these releases from the Cannonsville Reservoir into the West Branch have amounted to approximately One Billion Gallons during a day.

A second decision facing the City is the time span within which to make its required releases. The River Master requires only an *average* daily flow at Montague, and it is within the discretion of the City to release the required amounts over the whole 24-hour period, or in some shorter time. No evidence was introduced, however, which would indicate that such precipitous releases have ever been made by the City.

The final element affecting the flow of water in the River is the "conservation releases" that the City is required by order of the New York Supreme Court to make daily from each of its reservoirs releasing into the Delaware River. Such releases must be made independently of any called for by the River Master, but they are taken into consideration by the River Master in projecting the flow at Montague. The Cannonsville Reservoir is required to release 15 m. g. d. during the summer (April 16th through November 30, inclusive) and 5 m. g. d. during the winter (December 1st through April 15th, inclusive); the Pepacton Reservoir is required to release 12 m. g. d. during

the summer (April 8th through October 31st, inclusive) and 4 m. g. d. in the winter (November 1st through April 7th, inclusive). These figures were arrived at on the basis of pre-diversion low flows in the West and East Branches, and were ordered in order to maintain the environmental quality of the River. It has frequently happened that these "conservation releases" were, over extended periods of time, the only waters released into the Delaware River from the City's reservoirs. The right to have such "conservation releases" continued into the indefinite future is, of course, not graven in stone, nor do these plaintiffs have any vested property right in their perpetuation.

All the City's dams release water into the Delaware River from spillways or outlets at the bottom of the dam.

Because the required minimum flow is implemented at the Gauging Station at Montague, New Jersey, downstream from Port Jervis, when the River Master calls upon the City to release water from its various impoundments, he does so based only on the flow at Montague, and makes no specification as to the facility from which the City shall make the required releases.

As a result, the flow of water past plaintiffs' premises on any given day is not directly assured by provisions of the Decree and of the Compact, all of which are directly related to the flow at Montague, New Jersey, affected in great degree by power company releases and Neversink releases, which, as noted, enter the Delaware upstream of Montague, but downstream from plaintiffs' properties. The various facilities, drainage areas and their relative locations with respect to each other and the plaintiffs' premises are all as set forth in Defendant's Ex. A.

7. This is confirmed by a Memorandum filed in the Supreme Court by then Solicitor General Bork in 1976, pursuant to a request by the Clerk of that Court for information on the possible effects on the 1954 Decree of N.Y.Environ.Cons.L. § 15–0803, *et seq.* (July 27, 1976), concerning Regulation of Reservoir Releases. "For greater convenience in its operation, and because of the higher quality water in the Neversink and Pepacton Reservoirs, the city has taken the major portion of its water for city supply from those reservoirs and made the major portions of the downstream releases required under the decree from the Cannonville [sic] Reservoir." Memorandum at 2.

*The Delaware River Compact and New York's Environmental Conservation Law*

In 1961, all of the states touching on the Delaware River and affected by its flow entered into an Interstate Compact, with the approval of Congress, creating a Commission to regulate all diversions of water from the Delaware. Pub.L. No. 87–328, 75 Stat. 688 (1961). Section 3.5 of the Compact specifically prevented the Commission from impairing rights created by the Decree in *New Jersey v. New York* in 1954, except by the unanimous consent of the parties to that Decree. Under section 3.4, the parties relinquished, with certain immaterial exceptions, their rights to apply to the Supreme Court for a modification of the 1954 Decree.

On July 27, 1976, without consultation with the other signatory parties to the Compact or with the parties to the 1954 Supreme Court Decree, New York enacted an amendment to Title 15 of the New York Environmental Conservation Law, entitled "Regulation of Reservoir Releases." Although this occurred after the trial in this matter, the record in the case was reopened and a hearing held on September 14, 1976, in order to consider the effect, if any, of the new statute.

The legislative findings accompanying the amendment are in relevant part as follows [matter in brackets added]:

"[T]he legislature hereby finds that the volume and abrupt changes in the volume of releases of water from impounding reservoirs of water having a capacity of more than one billion gallons [including the Cannonsville and Pepacton Reservoirs] and located in the counties of Delaware, Greene, Putnam, Schoharie, Sullivan, Ulster and Westchester have damaged the recreational uses, such as trout fishing and canoeing, of waters affected by such releases, that such waters are a recreational resource for residents from all parts of the state of New York and elsewhere, that such recreational resource benefits the economy and welfare of this state and that the volume and rate of change of volume of such releases can be regulated to protect and enhance the recreational use of waters affected by such releases while ensuring and without impairing an adequate supply of water for power production or for any municipality which uses water from such reservoirs for drinking and other purposes." (N.Y.Envir.Conserv.L. § 15–0801).

Under the provisions of the law, the New York Commissioner of Environmental Conservation is empowered to promulgate rules regulating the "volume and rate of change in volume of releases of water" from impounding reservoirs in order to achieve the purposes of the Act. *Id.* § 15–0805(2).

The new statute is silent on the effects, if any, of the 1954 Supreme Court Decree or the Interstate Compact on the Commissioner's powers.

In late 1976, at the request of the Supreme Court, the parties to the 1954 Decree submitted memoranda concerning the effect, if any, of the New York legislation on that Decree. In its Memorandum, the State of New York concedes, as it must, that "the new law cannot legally conflict with the Decree, [and consequently] must be enforced so as to dovetail directly with the Decree." Memorandum at p. 7. The proposals for regulations submitted to the Commissioner by the State incorporate this principle. *Id.*

By a letter of January 22, 1977, the Clerk of the Supreme Court advised the River Master that the Court contemplated no further action in the matter.

In June 1977, the parties to the 1954 Decree signed a Memorandum of Agreement stipulating to a two-year redistribution of the "annual excess quantity" commencing on June 1, 1977. The River Master approved this Agreement on July 7, 1977.

Under the provisions of the June 1977 Agreement, the Pepacton Reservoir must release 70 c. f. s. of water each day from April through October of each year, and 50 c. f. s. daily from November through March. The Cannonsville Reservoir must release 45 c. f. s. daily from April 1st through June

14th; 325 c. f. s. daily from June 15th through August 15th; 45 c. f. s. daily from August 16th through October 31st; and 33 c. f. s. daily from November 1st through March 31st, each year. In addition, at times and from reservoirs to be determined by the State of New York, an amount not to exceed 6,000 second-foot-days per year must be released. The stated purpose of the releases is to prevent, as far as possible, the water temperature of the Delaware from *exceeding* 75° F., as measured at Callicoon, New York.

This Agreement between the parties to the 1954 Decree obviates, at least until its expiration in May 1979, any possible conflicts between the New York legislation and the Supreme Court Decree. In essence, the Agreement merely redistributes the "excess release quantity" on a daily basis, rather than over a 120-day period. The schedules governing the releases will be met only "to the extent the annual excess quantity will permit . . . ." Memorandum of Agreement at 2. Over the year, no quantity of water will be released into the Delaware greater than the amount which would have been released under the superseded system. Furthermore, it is implicit in the regulatory scheme that any excess releases are subject to the paramount needs of the City's water consumers in the event of extreme drought and/or temporary failure of the Croton or Catskill systems.

On November 2, 1977, the Commissioner of Environmental Conservation issued the regulations required by section 15–0805 of New York Environmental Conservation Law. 6 N.Y.C.R.R. Part 671.1. The regulations establish a two-year experimental program running concurrently with, and exactly duplicating the provisions of the June 1977 Memorandum of Agreement entered into between the parties to the 1954 Supreme Court Decree. The results of this experimental program, in turn, will "provide a basis for determining the manner such [reservoir] releases should be regulated on a long-term basis." 6 N.Y.C.R.R. § 671.-1.

These regulations also specifically preserve all rights established under the Supreme Court's Decrees, and set the maximum quantity of water to be released yearly under the regulations as the sum of (1) the releases necessary to maintain a flow of 1,750 c. f. s. at Montague, New Jersey, (2) the court-ordered conservation releases, and (3) the "excess quantity" releases required by the 1954 Decree. 6 N.Y.C.R.R. § 671.8.

In essence, the new regulations and the June 1977 Memorandum of Agreement merely provide for a more rational distribution of excess water already required to be released. As we discuss, *infra* pp. 869–872, a substantial item of damage resulting to plaintiffs from the City's impoundment and diversion activities on the Delaware and its tributaries is caused by (1) a marked change (decrease) in the average stream temperature of the water, compared to that found prior to the activities complained of; and (2) drastic fluctuations during the summer months occurring as the City makes sudden releases of water from the colder, bottom levels of its dams.

The long-term effect of these releases on ameliorating this situation with respect to water temperatures on the Delaware River is speculative at best. The City has consistently maintained, both before the Commissioner of Environmental Conservation and in this Court, that any requirement in future permanent regulations that quantities of water be released *in excess* of those ordered by the River Master would conflict with the 1954 Supreme Court Decree. The City points to the River Master's power over the "supervision and direction" of releases, *New Jersey v. New York*, 347 U.S. 995, 997, 74 S.Ct. 842, 98 L.Ed. 1127 (1954), and to the fact that releases in excess of those required by the River Master have in fact never been made by the City. For our purposes we concur in the validity of the legal position taken by the City, namely that the scheme of river regulation found in the Supreme Court Decree as amended is paramount. While a municipal corporation enjoys no rights under the Fourteenth Amendment against the state which created it, there are probably intervening rights

of individual and corporate water users in the City which would be protected in a proper case, arising out of the Supreme Court Decree.

*Plaintiffs' Property Rights Under Pennsylvania Law*

In prior decisions in these cases it has been consistently held that under Pennsylvania law riparian property owners enjoy rights in the natural flow of their adjacent streams, for injury to which they are entitled to bring an action for a continuing trespass. Familiarity with these prior holdings is assumed. Because the City has argued at length that all of the cases relied on in prior decisions involve riparian rights on non-navigable rivers, the Court will consider the issue further.

 Under our diversity jurisdiction, we are bound here by New York choice-of-law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Rosenthal v. Warren*, 475 F.2d 438 (2d Cir.), cert. denied 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973). Under the New York conflicts rules, when, as is the case here, the property against which the tort was committed is located in Pennsylvania, and the last act necessary to complete the tort (*i. e.,* the damage) occurred there, the law of Pennsylvania regulates the property rights of the plaintiffs, and defines the tort against those rights. It also determines the recovery. This is so whether the older *lex loci delicti* rule or the more current "center of gravity" or "grouping of contacts" theory is applied. *See, Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y. S.2d 743, 191 N.E.2d 279 (1963); *Conklin v. Canadian-Colonial Airways*, 266 N.Y. 244, 248, 194 N.E. 692 (1935).

Under the common law of England as applied in most of the states on the Atlantic seaboard, the holder of lands adjacent to a fresh-water stream, no matter what its size, was presumed to hold title to the stream and its bed *ad medium filum aquae* (to the center thread of the waters). Such riparian holders accordingly possessed certain extraordinary rights in the stream, such as the right to an exclusive fishery. *See generally, Attorney-General v. Philpott* (1632) [unreported, but discussed in *Attorney-General v. Richards*, 145 Eng.Rep. 980 (Ex.1795)]; S. Moore, *A History of the Foreshore and the Law Relating Thereto*, 896–907 (3d ed. 1888); Fraser, *Title to the Soil under Public Waters—A Question of Fact* (pts. 1–2), 2 Minn.L.Rev. 313, 429 (1918).

The contrary presumption prevailed when lands adjoined tidal waters. The holders of such lands were presumed to hold only to the line of mean-high water. *See generally, Dolphin Lane Associates, Ltd. v. Town of Southampton*, 37 N.Y.2d 292, 372 N.Y. S.2d 52, 333 N.E.2d 358 (1975); Deveney, *Title, Jus Publicum, and the Public Trust: An Historical Analysis*, 1 Sea Grant L.J. 13 (1976).

Both of these presumptions were phrased in terms of "navigability": tidal water was by definition "navigable," and fresh water "non-navigable."

This legal system was poorly suited to America, with its great coastal rivers, and historical practice of using mountain streams for driving logs. Accordingly, several states, including Pennsylvania, adopted the rule of the civil law according to which title to lands adjoining rivers which were navigable-in-fact extended only to the line of high or low water, rather than to the thread of the stream. *See, Rundle v. Delaware & Raritan Canal Co.*, 55 U.S. 80, 90–91, 14 L.Ed. 335 (1852); 3 *Kent's Commentaries* *430–31 (12th ed. 1873).

It is settled under Pennsylvania law that the main body of the Delaware River is navigable-in-fact. *See, Rundle, supra; Fulmer v. Williams*, 122 Pa. 191, 15 A. 726 (1888); *Carson v. Blazer*, 2 Binn. 475 (Sup. Ct.Pa.1810). Under the criteria there set forth, as well as under the commonly accepted and applied federal criteria, it is clear, and I so find, that all of the sections of the Delaware River relevant to this case, including the West Branch adjacent to the Van Loan/Elwood property, are navigable-in-fact. *See, e. g., The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870).

The Van Loan/Elwood property is located near Ball's Eddy, less than five miles above the confluence of the East and West Branches of the Delaware. In the last century, considerable rafting of lumber was done between Hancock, New York and Deposit, New York on the West Branch, and at the time "Ball's Eddy was said by some to be the rafting center of the West Branch of the Delaware, and more timber was reported rafted from [there] than any other one point along this branch." Leslie C. Wood, *Rafting on the Delaware River*, 179 (Livingston Manor, N.Y. 1934). *See also*, Report of the Special Master at 83, and Finding of Fact No. 25, at 203, affirmed by the Supreme Court, *New Jersey v. New York*, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931).

Under Pennsylvania law, title to lands adjoining navigable waters runs to low-water mark, with the lands between high and low-water mark being subject to the public's superior right of navigation and fishery. *See*, Pa. Act of June 25, 1937, P.L. 425 (1937); *Shaffer v. Baylor's Lake Association*, 392 Pa. 493, 141 A.2d 583, 585 (1958); *Monongahela Bridge Co. v. Kirk*, 46 Pa. 112 (1863); *Bailey v. Miltenberger*, 31 Pa. 37 (1856); *Shrunk v. Schuylkill Navigation Co.*, 14 S. & R. 71, 78–79 (Sup.Ct.Pa.1826); 3 *Kent's Commentaries* \*427(d) (12th ed. 1873).

Basing its arguments on this rejection by Pennsylvania of the common law doctrine of title to mid-stream on non-tidal rivers, the City has argued that Pennsylvania has also rejected the entire common law doctrine of riparian rights on such waters, and consequently plaintiffs have no rights against which a trespass could be committed.

There is no doubt that *some* riparian rights held at common law are not possessed by riparian holders on the Delaware River. *See, e. g., Shrunk v. Schuylkill Navigation Co., supra* and *Carson v. Blazer, supra*, which deny such holders an exclusive right of fishery.

The majority of cases referred to by defendant, however, are based on the unquestioned fact that riparians on navigable water in Pennsylvania do not hold title to the water itself, and may use it, for example, as a source of power, only at the will of the state. *See, e. g., Rundle v. Delaware & Raritan Canal Co.*, 55 U.S. 80, 14 L.Ed. 335 (1852); *Susquehanna Canal Co. v. Wright*, 9 Watts & S. 9 (Sup.Ct.Pa.1845); *Monongahela Navigation Co. v. Coons*, 6 Watts & S. 101 (Sup.Ct.Pa.1843). These cases are totally inapposite here, however, both because they relate to the absolute ownership of the water of a navigable stream—which is not in contention here—and because they are uniformly based on the Commonwealth of Pennsylvania's superior right to control the flow of streams in aid of navigation. Moreover, even these cases relied on by defendant do not purport to exclude all riparian rights along navigable streams. *See, e. g., Mayor v. Commissioners*, 7 Pa. 348, 367–68 (1847), which holds that a riparian owner on the navigable Schuylkill River retains the right to reasonable diversion and use of the stream.

At common law, every riparian enjoyed the right to have the stream flow as it was wont to flow:

"The unquestioned rule of the common law was that *every riparian owner* was entitled to the continued natural flow of the stream. It is enough, without other citations or quotations, to quote the language of Chancellor Kent, (3 Kent Com. § 439):

'Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (*currere solebat*) without diminution or alteration. No proprietor has a right to use the water, to the prejudice of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. "*Aqua currit et debet currere ut currere solebat*," is the language of the law. Though he may use the water while it runs over his land as an incident to the

land, he cannot unreasonably detain it, or give it another direction, *and he must return it to its ordinary channel when it leaves his estate.'* " *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 702, 19 S.Ct. 770, 775, 43 L.Ed. 1136 (1899) (emphasis added).

The Pennsylvania courts have frequently affirmed this common law doctrine of riparian rights in relation to non-navigable streams. *See, e. g., Scranton Gas & Water Co. v. Del. L. & W. R.R. Co.*, 240 Pa. 604, 88 A. 24 (1913); *James v. West Chester Borough*, 220 Pa. 490, 69 A. 1042 (1908); *Lord v. Meadville Water Co.*, 135 Pa. 122, 19 A. 1007 (1890). They have just as frequently made it clear that, except for exclusive fisheries and rights based on actual possession of the water of a stream, the riparian on navigable waters in Pennsylvania possesses the same rights as a riparian on non-navigable waters.

In *Williams v. Fulmer*, 151 Pa. 405, 25 A. 103 (1892), the defendant, an upper riparian owner on the navigable Lehigh River, diverted the stream from plaintiff's dam and defended his actions with much the same contentions as those made here by the City of New York. The Court held that the right to the water power itself had been granted by the Commonwealth exclusively to a third party, "but that the plaintiff was nevertheless entitled to recover for any injury he had sustained by reason of the diversion of the stream from its natural channel along the front of his land . . ." *Id.* at 413, 25 A. at 103.

"[Plaintiff] was the owner of land lying upon a navigable stream. The advantages of his location were inseparable from the ownership of the land, and if they increased its desirability, or added to its value, for purposes of business *or of pleasure*, they were his property as truly as the land itself.

The diversion of the stream was an injury to his land that was direct, peculiar, and not shared with the general public. It was as clearly actionable as the diversion of a stream passing over his land. Whoever brought about such diversion, so as to deprive him of the advantages of his location, whatever they were, inflicted a pecuniary wrong upon him. The manner in which the diversion is brought about is not important. . . . The lower riparian owner would be deprived of the natural advantages which ownership of the land at that point gave him, by the unlawful act of another, and he would have a right to call upon the wrongdoer to repair the wrong done him by restoring the stream to its channel, or making compensation for its loss." *Id.* at 414, 25 A. at 103. (Emphasis added.)

*See also, City of Philadelphia v. Commonwealth*, 284 Pa. 225, 130 A. 491 (1925); *Citizens Electric Co. v. Susquehanna Boom Co.*, 270 Pa. 517, 113 A. 559 (1921); 39 Pennsylvania Law Encyclopedia, Waters § 219 (1961).

The Third Circuit has summarized Pennsylvania's position on the riparian rights of holders of land on navigable waters:

"The ordinary rights of the owner of lands along which or through which a nonnavigable stream passes, have been long settled and are well understood. Such owner may use a stream thus flowing for his ordinary and domestic uses, or for any extraordinary purposes, so long as such extraordinary use does not interfere with the rights of others along or through whose lands the stream flows. These rights are incident to the lands in contact with the stream. They pass with the land and do not exist except in relation thereto. Enjoyment of such rights, in whole or in part, however, may be granted by the owner of the land to another, but the grantee has no property therein, and the stipulated enjoyment is only enforceable against the grantor.

The rights of riparian owners on navigable streams are essentially of the same character. Generally, they consist of right of access to the stream, as a public highway, and to such use of the water and the flow thereof as will not interfere with the public rights of navigation. There are other subordinate rights, such as the right to wharf into the stream, so

far as it may not interfere with the rights of others or with public navigation; the rights of fishery, etc. These rights, which may be called the natural rights of a riparian owner, are incident to the ownership of the land bordering upon the stream, whether navigable or not, and pass to the grantee of such lands without special mention in the deed of conveyance. If notoriously navigable, or declared to be so by legislative enactment, these natural rights are restricted so far as to exclude the right to any serious diversion of the water, by damming or otherwise. On such streams or rivers, the right to dam for milling purposes must be conferred by an exercise of the legislative will amounting to a license." *York Haven Water & Power Co. v. York Haven Paper Co.*, 201 F. 270, 275–76.

■ Accordingly, I find that these Pennsylvania plaintiffs were possessed of all the rights of riparians at common law, except for those rights, such as exclusive fishery and title to the bed and flow of the stream, that had been excluded by Pennsylvania's modification of the common law.

Most important of these rights was the right to the full natural flow of the Delaware River, both for commercial and recreational purposes, *aqua currit et debet currere ut currere solebat.* Included in the concept of natural flow is not only the right to an undiminished flow of the stream, *Clark v. Pennsylvania R. R. Co.*, 145 Pa. 438, 22 A. 989 (1891), but also the right to be free of unreasonable increases or fluctuations in the flow, *Kauffman v. Griesemer*, 26 Pa. 407 (1856); *Miller v. Miller*, 9 Pa. 74 (1848); *Standard Plate Glass Co. v. Butler Water Co.*, 5 Pa.Super. 563 (1897), and incidental rights, such as the right to a water-table maintained at its natural level. *Craig v. Shippensburg Borough*, 7 Pa.Super. 526 (1898).

■ We have not been cited to, nor able to find a Pennsylvania case directly ruling on the sort of thermal pollution of water involved here, but I believe that the common law of Pennsylvania includes a right to be free from such pollution and from unrea-

sonable fluctuations in water temperature which cause actual damage. A district court sitting in diversity must determine the common law of a state by examining the rationale for a given rule, developments in other states, and analogous areas of other states' law. *See, Bernhardt v. Polygraph Co. of America*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). Here, the right claimed exists in other jurisdictions, and presumably would be recognized by Pennsylvania's highest Court if the situation were to arise. *See, Sandusky Portland Cement Co. v. Dixon Pure Ice Co.,* 221 F. 200 (7th Cir.), *cert. denied* 238 U.S. 630, 35 S.Ct. 793, 59 L.Ed. 1497 (1915).

■ For a trespass against these riparian rights, in this case a continuing trespass with permanent damage, a cause of action for damages exists under Pennsylvania law. *See, Gregory v. City of New York*, 346 F.Supp. 140, 144 (S.D.N.Y.1972); *Elwood v. City of New York*, 271 F.Supp. 62 (S.D.N.Y. 1967); *Cochran Coal Co. v. Municipal Management Co.*, 380 Pa. 397, 110 A.2d 345 (1955); *Clark v. Pennsylvania R. R. Co.*, 145 Pa. 438, 22 A. 989 (1891); *Lord v. Meadville Water Co.*, 135 Pa. 122, 19 A. 1007 (1890); *Craig v. Shippensburg Borough*, 7 Pa.Super. 526 (1898).

■ Finally, plaintiffs' rights here are not subject to or diminished by any correlative riparian right of the City to reasonable use of the waters of the Delaware. The Special Master appointed in 1930 in *New Jersey v. New York* found that the City is not riparian to the Delaware or its tributaries. Report of the Special Master at 36 (1931). Even if the City were a riparian owner, however, its diversion of such enormous quantities of water from the River and out of the Delaware watershed is unreasonable. *See, Scranton Gas & Water Co. v. Delaware, Lackawanna & Western R. R.*, 240 Pa. 604, 88 A. 24 (1913); *In re Haupt's Appeal*, 125 Pa. 211, 17 A. 436 (1889); *Standard Plate Glass Co. v. Butler Water Co.*, 5 Pa.Super. 563 (1897).

*Defenses Based on the Supreme Court's Apportionment of the Delaware River*

Under this heading we discuss all the defenses raised by the City of New York based on the Delaware River Basin Compact (1961) and on numerous Supreme Court decisions adjudicating the rights of states, among themselves, to interstate streams. Basically, these arguments rest on two propositions: (1) that federal common law governs rights in interstate streams, and rejects the common law doctrine of riparian rights; and (2) that under this federal common law, as applied in *New Jersey v. New York, supra*, the rights of Pennsylvania in the Delaware River have been adjudicated, thus, under the principle of *parens patriae*, barring recovery by these Pennsylvania plaintiffs.

These defenses are each unsound, and have been summarily disposed of in several prior decisions in this case, but since the City has briefed them extensively, I will again address them.

The federal common law doctrine of equitable apportionment was developed by the Supreme Court in answer to the problems raised by conflicting claims of states as sovereigns, to the waters of interstate rivers. These conflicts have frequently arisen, often between states with opposed notions of water law. In *Kansas v. Colorado*, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907), for example, Kansas had adopted the common law of riparian rights and accordingly demanded that the Arkansas River flow down to it from Colorado without diminution. Colorado had adopted the Western, or dry-state doctrine of prior appropriation or apportionment.

In these interstate conflicts, the Supreme Court has held that the apportionment of waters, *as between the sovereign states*, presents a federal question to be resolved according to federal common law, and has resolved such cases by developing and applying the doctrine of equitable apportionment. Under this doctrine, neither claimant state's law governs, and the waters are apportioned equitably according to a variety of factors. *See, Illinois v. City of Mil-*

*waukee*, 406 U.S. 91, 105, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945); *Hinderlider v. La Plata & Cherry Creek Ditch Co.*, 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938); *Wyoming v. Colorado*, 286 U.S. 494, 52 S.Ct. 621, 76 L.Ed. 1245 (1932) and 259 U.S. 419, 42 S.Ct. 552, 66 L.Ed. 999 (1922); *Connecticut v. Massachusetts*, 282 U.S. 660, 670, 51 S.Ct. 286, 75 L.Ed. 602 (1931); *Kansas v. Colorado, supra.*

In *New Jersey v. New York*, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954) and 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931), the Supreme Court applied this doctrine to the apportionment of the waters of the Delaware River. New Jersey in both cases urged, unsuccessfully, application of the strict rule of the common law under which the River would "come down to it undiminished." 283 U.S. at 342, 51 S.Ct. 478.

Pennsylvania intervened in the cases to protect its own sovereign interests, but the motion of the City of Philadelphia to intervene was denied by the Supreme Court on the principle that "the state, when a party to a suit involving a matter of sovereign interest, 'must be deemed to represent all its citizens'." *New Jersey v. New York*, 345 U.S. 369, 372, 73 S.Ct. 689, 691, 97 L.Ed. 1081 (1953), *quoting Kentucky v. Indiana*, 281 U.S. 163, 173–74, 50 S.Ct. 275, 74 L.Ed. 784 (1930).

In neither Delaware River case, however, did the Supreme Court *directly* rule on the effect of its Decrees on individual riparian owners. To the extent the subject was considered at all, the Court's holding is favorable to these plaintiffs:

> "No diversion herein allowed shall constitute a prior appropriation of the waters of the Delaware River or confer any superiority of right upon any party hereto in respect of the use of those waters." *New Jersey v. New York*, 347 U.S. at 1004, 74 S.Ct. at 846.

Furthermore, under the Eleventh Amendment and the principles governing *parens patriae* suits between states, the

rights of these individual plaintiffs could not have been advanced by Pennsylvania in the Delaware River cases against New York.

Parens patriae suits must involve a sovereign or quasi-sovereign interest of the states, rather than a "mere collectivity" of the private interests of their individual citizens. *Pennsylvania v. New Jersey*, 426 U.S. 660, 665, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976). *See also Hawaii v. Standard Oil*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Commonwealth of Pennsylvania v. Kleppe*, 174 U.S.App.D.C. 441, 533 F.2d 668 (1976). In equitable apportionment cases in which the plaintiff state has pleaded its own private interest as a riparian, the Court has specifically excluded such interests from consideration. *See, e. g., Kansas v. Colorado*, 206 U.S. 46, 98, 27 S.Ct. 655, 668, 51 L.Ed. 956 (1907) ("We need not stop to consider what rights such private ownership of property might give."). In addition, any *parens patriae* suit brought against another state to recover for injury to the property rights of individual citizens would be barred by the Eleventh Amendment. *See, New Hampshire v. Louisiana*, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883).

It is well settled that the individual states may, by legislation or judicial decision, establish or adopt rules of property law which create or enforce riparian rights, and rights in water generally. "[If the States] choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections." *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). *See also, Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 320, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); *Fox River Paper Co. v. Railroad Comm'n.*, 274 U.S. 651, 655, 47 S.Ct. 669, 71 L.Ed. 1279 (1926); *Port of Seattle v. Oregon & Washington R. R.*, 255 U.S. 56, 41 S.Ct. 237, 65 L.Ed. 500 (1920); *Scott v. Lattig*, 227 U.S. 229, 242, 33 S.Ct. 242, 57 L.Ed. 490 (1913); *Kansas v. Colorado*, 206 U.S. 46, 93–94, 27 S.Ct. 655, 51 L.Ed. 956 (1907); *Havidin v. Jordan*, 140 U.S. 371, 380, 11 S.Ct. 808, 35 L.Ed. 428 (1891); *Hoboken v. Pennsylvania R. R.*, 124 U.S. 656, 8 S.Ct. 643, 31 L.Ed. 543 (1887); *Barney v. Keokuk*, 94 U.S. 324, 24 L.Ed. 224 (1876). Most of the original states adopted the common law of England as received and applied in their jurisdiction under colonial rule. *See, e. g.*, Art. 1 § 14 of the New York Constitution of 1938, originally found in Art. 35 of the Constitution of 1777, and Schedule No. 1, § 2 of the Pennsylvania Constitution of 1874.

It is equally clear, however, that insofar as actual diversions of water are concerned, no individual state can bestow on its citizens by its local property law, a right greater than that to which the state itself is equitably entitled.

"It may be assumed that the right adjudicated by the [Colorado] decree of January 12, 1898 to the Ditch Company is a property right indefeasible so far as concerns the State of Colorado, its citizens, and any other person claiming water rights there. But the Colorado decree could not confer upon the Ditch Company rights in excess of Colorado's share of the stream; and its share was only an equitable portion thereof." *Hinderlider v. La Plata & Cherry Creek Ditch Co.*, 304 U.S. 92, 102, 58 S.Ct. 803, 807, 82 L.Ed. 1202 (1938).

*See also, Wyoming v. Colorado*, 286 U.S. 494, 508, 52 S.Ct. 621, 76 L.Ed. 1245 (1932); and *United States v. Nevada*, 412 U.S. 534, 539, 93 S.Ct. 2763, 37 L.Ed.2d 132 (1973).

Relying on these cases, the City argues that the common law doctrine of riparian rights is abrogated in streams the waters of which have been apportioned by Supreme Court Decree or Interstate Compact, and that, in this instance, the rights of these plaintiffs have been adjudicated with those of Pennsylvania and are thus barred.

As to the first point, it is clear from the cases cited above that riparian rights within a state are purely a matter of that state's concern, generally regulated by local property law, and are not, *by that fact alone*, destroyed or altered when the Supreme Court applies federal common law *to conflicts between the states* and apportions the total waters of the stream among the various competing interests. It should also

be noted that federal common law itself is not synonymous with the abrogation of riparian rights: "[T]he quality of being riparian, especially to navigable water, may be the land's 'most valuable feature' and is part and parcel of the ownership of the land itself." *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 326, 94 S.Ct. 517, 526, 38 L.Ed.2d 526 (1973); *Hughes v. Washington*, 389 U.S. 290, 293, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967).

To adopt a contrary position would lead to the anomalous result that Pennsylvania landowners on the Delaware have been deprived of their rights, even as against each other. The City's second argument seeks to blunt what could otherwise be seen as a certain inequality, the fact that the City has compensated owners of New York riparian property for the loss of their property rights, and has failed to compensate Pennsylvania riparians for the same loss. The City contends that, by the Court's Decree, New York State's present total share of the waters of the Delaware is 800 m. g. d., and that the City, in appropriating *all* of that share for its own uses, is thus bound to compensate New York riparians for their loss of participation in New York's share, but is not bound to compensate Pennsylvania residents, since they continue to enjoy all that they were ever entitled to enjoy—*i. e.*, Pennsylvania's share.

With this argument the City has proved both too much and too little. Too much, because this position cuts against the City's first argument concerning the applicability of federal common law: if the Supreme Court's Decrees abrogate the common law doctrine of riparian rights, New York riparians, as well as those in Pennsylvania, have no rights for the taking of which compensation must be made.

At the same time, the City's argument falls short of meeting the present situation. Even if we accept for the sake of argument the contention that Pennsylvania riparians on the Delaware are presently enjoying the full volume of water to which they were ever entitled, the fact remains that the City by its dams has materially altered and worsened the remaining waters of the Dela-ware, that is, has worsened the portions allotted, under the City's arguments, to Pennsylvania, New Jersey and Delaware. As the common law maxim runs: *sic utere tuo ut alienum non laedas* (property must be used in such a way as not to injure the property of others). As we shall discuss below, the City's works have adversely affected the temperature, flow, stage and quality of the River. The Supreme Court's Decrees were certainly not intended as licenses for the City to commit such injuries without liability.

■ Moreover, even that portion of the City's argument relating to the *quantity* of water must be rejected because the City's diversion of "its" 800 m. g. d. adversely affects the *quality* of the water allotted to the other states bordering on the Delaware. A diminished volume of water flows in the old bed of the River and the River is at times and in parts turned into a swamp. The City undoubtedly has the right to take its share of the Delaware, but must exercise its right in such a way that the rights of others are not abridged, or alternatively must compensate for the loss or damage.

It is noteworthy that by the City's own argument, the City has avoided paying owners of New York property for the full loss of their riparian rights, since some water continues to flow in front of their land. In effect, the City has taken and paid compensation for only part of the value of the riparian rights of New York property owners, and has at the same time trespassed upon the rights of Pennsylvania riparians and refused to pay them anything for their identical loss.

■ Finally, there is no merit to the City's remaining defenses based on federal apportionment of the Delaware. The Supreme Court's retention of jurisdiction in *New Jersey v. New York* does not deprive this Court of jurisdiction, since jurisdiction was explicitly retained only over the *parties* to that case, to enable them to seek a modification of the Court's Decree. 347 U.S. at 1005, 74 S.Ct. 842.

Nor does the Delaware River Basin Compact deprive plaintiffs of their rights. Section 14.19 of that Compact expressly provides:

"Nothing contained in this compact shall be construed as affecting or intending to affect or in any way to interfere with the law of the respective signatory parties relating to riparian rights."

*Injury to Riparian Property on the Delaware*

██ The courts have been called on repeatedly to adjudicate the question of the effect of the City's dams and diversions on the Delaware and its tributaries, and on New York property fronting on the River. In each such case, counsel for the City has argued that the effects of diversion were minimal, or even that they were beneficial. In each case the courts have found against the City on the question, and the City should be barred from relitigating the issue here. Consequently, although plaintiffs' evidence at trial independently proved that the City's actions were detrimental to the temperature, stage, flow and quality of the River and to adjacent property, as I so find, this Court will not here repeat at length what has been done exhaustively elsewhere.

The Report of the Special Master appointed by the Supreme Court in 1930 summarizes the voluminous evidence presented to the Master on the effects of the City's proposed diversion of 600 m. g. d. The Master found that "[t]he effect of the New York diversion on the recreational uses of the river will be to cause somewhat more than slight damage, particularly as affecting the reputation of the river as a place of recreational resort." *Id.*, Finding of Fact No. 37, at 205. The Master accordingly recommended that the City's diversions be limited to 440 m. g. d.

The Supreme Court specifically approved the Master's findings and restricted the City's diversions to 440 m. g. d.:

"The Master finds that the taking of 600 million gallons daily from the tributaries will not materially affect the River or its sanitary condition, or as a source of mu-

nicipal water supply, or for industrial uses, or for agriculture, or for the fisheries of shad. The effect or the use for recreation and upon its reputation in that regard will be somewhat more serious, as will be the effect of increased salinity of the River upon the oyster fisheries. The total is found to be greater than New Jersey ought to bear, but the damage can be removed by reducing the draft of New York to 440 million gallons daily . . ." 283 U.S. at 345, 51 S.Ct. at 480.

The Special Master appointed by the Court in 1954 refrained from making findings of fact, and merely recommended that the City's allotment be increased to its present 800 m. g. d. The Master noted, however, that "Pennsylvania, New Jersey and Delaware, while not showing any present damage, have adduced extensive proofs to the effect that the New York plan will cause them substantial damage in the future and strongly urge that they be given protection against that possibility if the New York plan be now authorized." Report of the Special Master at 107 (filed May 27, 1954).

In addition to these findings made by Special Masters appointed by the Supreme Court, Commissioners appointed by the New York Supreme Court pursuant to Title K of the Administrative Code of the City of New York have also considered and made findings on the condition of the Delaware River from Hancock to Skinners Falls, New York, that is, on the condition of the River as it flows in front of the property of all of these plaintiffs here, except that of Van Loan/Elwood. In each case, the City argued that its regulation of the flow of the River was beneficial, or only minimally harmful, and in each case different boards of Commissioners have found *de novo* that the City's diversions had adversely and permanently affected the River. Each of these determinations in turn has been confirmed by a Justice of the New York Supreme Court and by the Appellate Division. *See, e. g., In re Maguire (Wingert)*, unpublished opinion of Conway, J., dated October 16, 1973, *aff'd.*, 48 A.D.2d 958, 370 N.Y.S.2d

680 (3d Dept.), *motion for leave to appeal denied*, 37 N.Y.2d 712, 380 N.Y.S.2d 1025, 343 N.E.2d 289 (1975); *In re Maguire (McBride)*, unpublished opinion of Conway, J., dated April 16, 1971, *aff'd.*, 38 A.D.2d 795, 327 N.Y.S.2d 1032 (3d Dept. 1972).

The issue in those cases is precisely the issue here. In *In re Maguire (Wingert)*, for example, the Court stated:

"There was considerable testimony in this case as to the damage to such recreational activities as fishing and swimming in the river as the result of diversion of the Delaware by New York City. In *Matter of Ford (City of New York)*, 18 A.D.2d 855, 236 N.Y.S.2d 591, 593, also involving diversion of the Delaware by New York City, this court found that it was 'abundantly clear that a very large part of the value before the taking was in fact attributable to the recreational facilities afforded by the river and subsequently in large part destroyed' by the diversion of the waters. The expert testimony in these cases . . . as to what the value of the properties would have been was properly received and considered by the commissioners as an aid to their determination of the loss to respondents, including that occasioned by the damage to the river as a recreational area. We find that the awards in all these cases rested upon sufficient evidence in the record . . . ." 48 A.D.2d at 959, 370 N.Y.S.2d at 682.

■ The City objects to the application of collateral estoppel here because it claims that the issues involved in the Title K proceedings and in these cases are different, and that the standard of proof applicable in Title K proceedings is different from the standard before this Court. Both these contentions must be rejected.

The issue here, harm caused to the Delaware River by the City's actions in impounding and diverting water, is precisely the issue involved in the Title K proceedings, and decision on that question was essential to the determinations in each of those proceedings.

Secondly, under Title K the court-appointed Commissioners are a quasi-judicial tribunal, whose powers include the right to issue subpoenas, administer oaths, take testimony, and make findings of fact. Since 1964, the scope of the Appellate Division's power to review the findings of these Commissioners has included the power to "re-evaluate the record and make its own findings" in order to modify or reject an award if necessary to conform it to the evidence presented. *In re Ford (Siska)*, 22 N.Y.2d 834, 837, 293 N.Y.S.2d 101, 102, 239 N.E.2d 731, 732 (1968). *See also, In re Ford*, 35 A.D.2d 645, 312 N.Y.S.2d 966 (3d Dept. 1970). This power to review the findings of the Commissioners effectively disposes of the City's main objection to the application of the principle of collateral estoppel in this case.

The City has had more than a fair opportunity to litigate the question of damage to the Delaware River and should not be allowed to re-litigate it here. Mutuality of estoppel is no longer a prerequisite for the application of collateral estoppel. *See, Shore v. Parklane Hosiery Co., Inc.*, 565 F.2d 815 (2d Cir. 1977); *Zdanok v. Glidden Co.*, 327 F.2d 944 (2d Cir.), *cert. denied* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). The *Shore* case, *supra*, applied a federal rule of estoppel by judgment in a case arising under the federal securities laws. We regard the matter as procedural, not substantive, and therefore not limited by *Erie* principles. In any event, New York seems no longer to require mutuality. *See, Schwartz v. Public Administrator*, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969).

■ In addition to these judicial findings, the New York Legislature has also made its own findings in connection with enactment of Chapter 888 of the Laws of 1976. The New York Legislature found that reservoir releases "have damaged the recreational uses, such as trout fishing and canoeing" below the City's dams. N.Y. Environmental Conservation Law § 15–0801. While these findings are not conclusive upon this Court, and may be rebutted by

contrary evidence, they are entitled to some weight. *See, e. g., Chastleton Corp. v. Sinclair,* 264 U.S. 543, 547, 44 S.Ct. 405, 68 L.Ed. 841 (1924).

In this case, these legislative findings have not been controverted. Indeed, these findings have been established independently by the evidence introduced at trial by the plaintiffs and their expert witnesses.

Defendant's Ex. C, introduced at the trial, graphically indicates the scope of the City's manipulation of the natural flow of the Delaware. It shows that in a typical year, 1971, for example, the City diverted for its own uses and stored some 28% (200 billion gallons) of the flow and manipulated by its releases and spills a further 18.6% (150 billion gallons) as measured at Callicoon, New York. The amount annually diverted by the City is approximately 88% of the full amount allowed by the Supreme Court's Decree.

The River Master's Annual Reports show the details of this manipulation. In 1969 for example, the City released only the minimum conservation releases for 14 consecutive days in June, and then in July released approximately a billion gallons a day for 11 consecutive days. From the end of July until mid-August, only conservation releases were made. At the end of August, there again followed another extended period of releases averaging one billion gallons per day. This same general pattern has been followed in succeeding years.

On the trial of this action, the City introduced the testimony of Mr. Stanton, an engineer and acting director of the City's Bureau of Claims, to show that extreme low flows after the diversion were, on a *monthly* average, considerably higher than prediversion low flows. I find this to be true, but such evidence does not rebut or negate the effect of the plaintiffs' evidence of enormous fluctuations on a *daily* basis.

Mr. Paul E. Blomquist, an expert called by the City, testified as follows on the fluctuation in flow as it affected one of the properties in this case, that of Van Loan/Elwood:

A. "With regard to Van Loan, which is on the West Branch of the Delaware River, subject principally to the larger releases when they are necessary, from Cannonsville Reservoir, there would be a pronounced increase in the flow past that property under conditions of high release in the summer months . . . .

Q. Mr. Blomquist, if you will pardon an interruption, you said 'an increased flow.' Increased from what?

A. Above what would have passed by absent the reservoir. As a matter of fact, substantially increased flows because of the operating policy of the City of New York at this time.

Now, during the years when the run-off is high and the reservoir is being recharged, then the river below the dam would be getting less than the normal or the natural flow; and as a consequence of that, there would be less flow in the river past Van Loan than there would have been absent the reservoir.

Now, this is a condition which is brought about by all of this. In weather conditions, with the dry weather, a drought period, there are extended or high releases from Cannonsville, which augment the flow at Van Loan or at any point between Van Loan and the dam; and then, when the flow at Montague, where no releases are necessary, then there is an effect of withholding, a short reduction of flow." (Transcript, pp. 59–60.)

The plaintiffs' proof at trial showed the adverse effect these fluctuations in volume, stage and flow had on canoeing and other water recreations. One witness testified that he had seen an automobile driven across the Delaware above the Canfield property during a period of low flow.

An obvious effect of these great fluctuations in volume has been an enormous range in summer water temperatures in the River. In every body of deep, still water, such as the Cannonsville and Pepacton Res-

ervoirs, thermal stratification occurs, with the thermocline usually at about 25 feet. Below that depth, in the hypolimnion, water temperatures average 40° F. Because both of these Reservoirs release water into the River from spillways in the bottom of the dams, water is released in normal periods at about 40 degrees.

The effect of these cold releases is more apparent, of course, the nearer one approaches the source of the releases, and so is most apparent at the Van Loan/Elwood property which is approximately five miles above the confluence of the East and West Branches. However, these effects are still felt at the Canfield property which is some 40 miles below these dams.

██ A correlation of summer water temperatures, as measured at Callicoon, New York (situated between the Canfield and Gregory properties) and water releases by the City shows that when the releases were minimal, water temperatures closely approximated air temperatures and averaged in the 70's Farenheit. When the City's releases approached or exceeded one billion gallons a day, the water temperature dropped into the low 60's or upper 50's. These figures, derived from exhibits prepared by the City, are confirmed by plaintiffs' Ex. 24, an official report prepared by the United States Geological Survey in 1964. The report is properly admissible here under Rule 803(8), F.R.Evid.

Each of the plaintiffs testifying at the trial mentioned the immediate and adverse effect such fluctuations in temperature had on swimming, but the more serious consequences were those affecting fisheries in the Delaware.

Before the diversion of the headwaters of the Delaware, the River was considered a warm-water stream, with summer temperatures averaging in the 70's or low 80's. At that time, the major fishery in the main body of the River was for small mouth bass and walleyed pike, but there was some fishing for trout near the spring holes and near the mouths of tributaries.

Mr. Edward C. Raney, an ichthyologist, testified for plaintiffs on the deleterious effects of the City's diversion of water from the Delaware. Briefly, he testified, and I find, that the City's dams act to prevent normal spring freshets which formerly cleansed the River of slime and algae and of accumulated rubble at the mouths of tributaries. The consequence of the general stagnation of the River and the growth of slime along it has been a general increase in mosquitos and insects on riparian property. The consequence of the formation of deltas at the mouths of tributaries to the Delaware has been a marked change in the normal habits of fish in the River and their exclusion in some degree from the tributaries.

Low winter flows in the River have allowed ice to form to the bottom of the stream in many places, destroying the aquatic organisms on which fish feed.

The fluctuations in temperature caused by the City's diversions have almost totally destroyed the warm-water fisheries in the River. The optimum temperature for warm-water fish is between 70° and 80° F. and, as mentioned above, the City's releases have frequently acted to reduce the summer water temperatures for prolonged periods to the low 60's or upper 50's. In addition, high releases of water during the spawning season have driven bass from their nests and prevented the propagation of young.

The same fluctuation in temperature and flow has in large measure blocked efforts to turn the River into a cold-water fishery for trout: low flows from the City's dams allow the temperature of the River to approach air temperature, which, in the summer months, is usually in the range from 70° to 80° F. Unless trout can hide in a cold spring or inlet until the next City release, they will be subjected to trauma or death.

Mr. Raney's observation of fishing on the Delaware were all made before 1965, but the conditions upon which he based his opinions still exist and are largely unchanged. In addition, his opinions were borne out by those of Harry Darby and

872

Harry Phillips, both active anglers with more recent experience of the River.

■ On the trial of this action, plaintiffs sought to have admitted into evidence a report, issued by the New York State Department of Environmental Conservation, entitled "Proposed Alternative Releases from New York City Reservoirs in the Upper Delaware River Basin" (1974). The factual material contained in the report is clearly admissible, see Rule 803(8)(C), F.R. Evid., N.Y. Environ. Conserv. Law § 3–0301, and *Williamson v. Union Oil Co. of California*, 125 F.Supp. 570 (D.Colo.1954). This report generally reinforces plaintiffs' contentions concerning the precarious position of cold-water fisheries in the Delaware.

■ A more serious problem with the report, however, is one that has only arisen since 1976 when the City began to make increased daily releases under the new Environmental Conservation Law. The opinions contained in the report are to the effect that increased flows would in large measure serve to stabilize the trout fisheries in the Delaware. While these opinions as such may not be admissible, this Court may take judicial notice of the elementary laws of physics and draw its own conclusions from them and from evidence already properly admitted. Accordingly, I find that even if the new statutory minimum flow were to be maintained by the City (a condition which will by no means necessarily occur), it would not be sufficient to repair the damage done to the River by the City's diversions, even as concerns the trout fisheries: spring freshets would still be lacking in the River, deltas would still form at the mouths of tributaries, blocking trout seeking refuge in the cooler waters, and the massive fluctuations in temperature, flow and velocity, produced by the City's meeting the Montague formula would still occur.

■ The plaintiffs have not only proved that the River has been harmed, and with it their properties, but they have also established that the harm is permanent, in the sense that it is likely to continue while the City's dams and reservoirs endure. As dis-

cussed above, the new regulations enacted under the Environmental Conservation Law in no way detract from this conclusion.

The evidence introduced by the City on the condition of the Delaware River fisheries does not rebut the testimony of plaintiffs and their witnesses. One of the City's biologists only grudgingly admitted that the City's diversions and dams had caused *any* damage to the fishing, a position that is scarcely tenable. A second expert, Mr. Grim, admitted that the River had been adversely affected, but differed with plaintiffs only on the question of degree.

*Necessary and Proper Parties*

■ The City has argued that this action must be dismissed since certain parties, notably the Commonwealth of Pennsylvania and the State of New York, are absent and are necessary to the resolution of the controversy. This argument is without merit. *See, Brooks v. United States*, 119 F.2d 636, 643 (9th Cir. 1941). This Court is neither apportioning the waters of the Delaware nor questioning the validity of prior apportionments. All that is in issue here is a trespass to a private property right protected both by the property law of New York and Pennsylvania, as well as the Fourteenth Amendment. And the sole trespasser is the City of New York.

The City has also argued that the Lake and Van Loan/Elwood claims must be dismissed because those plaintiffs had sold their properties long *before* filing a Notice of Claim, and consequently had been out of possession at all times during which an actionable trespass occurred.

Generally, in Pennsylvania and New York, for a plaintiff to recover damages for trespass to property, he must have possession of the land, or the right to immediate possession of it, at the time of the injury. Nevertheless, the right to recover damages for a trespass or a taking is a personal one, assignable or retainable by a vendor. *See, e. g., In re Appointing Viewers to Assess Damages*, 409 Pa. 290, 186 A.2d 20 (1962); *McFadden v. Johnson*, 72 Pa. 335 (1872). And this is so whether the cause of action

has already accrued when assigned, or is yet to arise. In the analogous situation where a grantor reserves, in a deed, damages with respect to the existing and future condemnation of land, the Pennsylvania courts have upheld the grantor's rights. *See, e. g., Chapleski v. Commonwealth of Pennsylvania, Dept. of Highways,* 5 Pa.Cmwlth. 482, 291 A.2d 360 (1972).

Both New York and Pennsylvania favor free alienability of interests in land. Having accepted a deed with such rights reserved and excluded, subsequent transferees of the damaged parcels would be hard put to make any claim against the City, and accordingly there is no way in which the City would be likely to pay twice. If the City's arguments with respect to lack of standing were to be accepted here, no one would be able to sue to recover for a clearly proved trespass: these plaintiffs would be barred because they are out of possession, while the vendees in possession would be barred by the exclusions and reservations in their deeds.

■ I find and conclude that both these plaintiffs reserved in their deeds of conveyance all rights against the City of New York and are entitled to bring their actions on the theory that they are suing to enforce retained rights, or alternatively, on the theory that acceptance of the respective contracts of sale and deeds constituted an equitable assignment by the vendees to these plaintiffs of their possessory right of action.

■ Finally, George Elwood, as Administrator d. b. n., c. t. a., is the proper party to bring this action for the benefit of the Van Loan Estate. His powers as Administrator included the power to sell the property. This he did, expressly retaining in the deed "rights acquired and to be acquired" against the City.

Mr. Elwood's account to the Orphan's Court of Wayne County, Pennsylvania, set forth in detail his activities in pursuing the rights of the Estate against the City of New York, and the account was approved by the President Judge of that Court on September 11, 1967.

Essentially, Mr. Elwood's actions in this litigation are authorized as a necessary adjunct of his testamentary power to sell the real property of the Estate on reasonable terms, and to retain and enforce rights already accrued or to arise in favor of the decedent's ownership, against the City.

*Damages*

On the trial of this action both parties presented evidence on the value of plaintiffs' properties and also presented appraisals made by their respective experts. In addition, on June 27, 1975, in the company of counsel, I made a personal inspection of all of the damaged properties and several other properties used as comparables in the appraisals.

In *Elwood v. City of New York,* an unpublished opinion dated March 27, 1973, Judge Pierce of this Court held with regard to one of the plaintiffs here that the "initial period of the claim would be limited . . . to encompass trespass only up to 90 days before the notice of claim was filed." *Id.* at 4. This is the proper standard to be used in computing damages in all these cases. *See also, Hackensack Water Co. v. Village of Nyack,* 289 F.Supp. 671 (S.D.N.Y.1968).

■ The City argues from this ruling that four of the five plaintiffs here are barred from recovery because in each of their cases the date of the sworn appraisal submitted was more than 90 days before the filing of a Notice of Claim with the City. All these appraisals were made by Mr. Rodman Fellows, who uniformly used October 20, 1971 as the date for appraisal. Mr. Fellows' appraisals were properly admitted and form the basis for his direct testimony on the value of the plaintiffs' properties given at trial. Moreover, to the extent plaintiffs' appraisals are credible for the period they claim to reflect, they are, in the light of the generally upward trend in real estate prices proved on the trial, a *minimum* estimate of damages, valid for later periods for which damages are properly recoverable. Accordingly, this date variance is not a basis for dismissal. Damages will be determined by the Court based on

the entire record, and as of the date ninety days prior to filing a Notice of Claim, hereinafter the "damage date." Plaintiffs have proved a continuing and permanent trespass by the City with respect to their riparian rights. In a continuing trespass, "each new day establishes the cause anew." *Bloss v. Village of Canastota*, 35 Misc.2d 829, 831, 232 N.Y.S.2d 166, 168 (Sup.Ct.Mad.Co.1962). *See, Gregory v. City of New York*, 346 F.Supp. 140, 144 (S.D.N.Y.1972).

Consequently, these plaintiffs, as we held in *Gregory*, cannot be barred forever by the "late" filing of their Notices of Claim; nor are they prevented by the date of filing of their Notices of Claim, from presenting estimates of value valid for any date within the period extending from 90 days prior to filing their Notices to the time of trial. We answer now, in the negative, the question posed in *Gregory, supra*, at 145:

"If, as appears likely, lump sum damages are assessed to cover the diversion from inception into perpetuity, or near perpetuity measured by the future life of the dams, will such damages be lessened materially because the first five or six years of such permanent diversions are excluded?"

█ Plaintiffs' motions to strike the appraisals of Mr. Walter Donnaruma, on the ground that they lack detailed adjustments for time and location, are denied. The appraisals are admissible within the philosophy of Rule 401, F.R.Evid., regarded as declaratory of existing law in this Court. In any event, adequate notice and opportunity to demand such adjustments prior to trial existed, and were not availed of.

There is another difficulty with the Donnaruma appraisals which goes only to their weight and significance. They are based on the clearly false premise that no adverse consequences whatsoever were caused to riparian property on the Delaware by the construction and operation of the Cannonsville and Pepacton Reservoirs. Consistent with that view, all of Mr. Donnaruma's comparable "before" values comprised riparian properties on the Delaware, which themselves had been affected by the City's

diversion. This approach was rejected in *In re Maguire (Wingert)*, 48 A.D.2d 958, 370 N.Y.S.2d 680 (3d Dept.1975), in which the City relied on similar appraisals by Mr. Donnaruma, and it is rejected here.

█ The proper method of appraisal and the manner in which damages must be computed is based on the difference between the market value of the damaged parcel, as subjected to the permanent trespass on the damage date, and the market value of the parcel as it would have been on that date, but for the trespass.

As stated in *In re Maguire (Wingert), supra*, at 958–59, 370 N.Y.S.2d at 682:

"The primary contention of appellants is that respondents' expert, in all the cases excepting Phillips', by basing his estimation of damages on the value that the subject properties would have had but for the loss of riparian rights, rather than upon the actual decrease in value, submitted proof which was speculative and inadequate. The permissibility of introducing expert testimony with respect to both the present value of the premises with the water diverted and also as to what the present value would be had there been no diversion was upheld by this court in *Gallagher v. Kingston Water Co.*, 25 App.Div. 82, 49 N.Y.S. 250, aff'd 164 N.Y. 602, 58 N.E. 1087. . . . 'The expert * * * necessarily has to consider both benefits and injuries and balance the account—which is the very thing the jury have to do. The majority of the court thought it better that all the conditions affecting values be shown, and thereupon the court or jury should determine. In the case before us there are no benefits to be considered. It is a simple question of value, with or without the water * * * Experts know better than the nonexpert' (*Gallagher v. Kingston Water Co., supra*, 25 App.Div. pp. 85, 86, 49 N.Y.S. 253). We find no case modifying the basic holding in *Gallagher* and the reasoning therein is applicable to the instant situation. The takings herein have not brought benefits to respondents' properties and we are presented with a

simple question of value upon which expert testimony would be most useful. There was considerable testimony in this case as to the damage to such recreational activities as fishing and swimming in the river as the result of diversion of the Delaware by New York City. In *Matter of Ford (City of New York)*, 18 A.D.2d 855, 856, 236 N.Y.S.2d 591, 593, also involving diversion of the Delaware by New York City, this court found that it was 'abundantly clear that a very large part of the value before the taking was in fact attributable to the recreational facilities afforded by the river and subsequently in large part destroyed' by the diversion of the waters. The expert testimony in these cases (excepting Phillips') as to what the value of the properties would have been was properly received and considered by the commissioners as an aid to their determination of the loss to respondents, including that occasioned by the damage to the river as a recreational area. We find that the awards in all of these cases rested upon sufficient evidence in the record and fell within the range of expert testimony with regard to damages and values."

*Cf., Rider v. York Haven Water Co.*, 251 Pa. 18, 95 A. 803 (1915); *Miller v. Windsor Water Co.*, 148 Pa. 429, 23 A. 1132 (1892).

Mr. Fellows' appraisals follow this approach and include very detailed adjustments made for time of sale and size of parcel. None of the comparable sales is remote in time from the valuation date. Each of Mr. Fellows' "before" sales was a sale of recreational land fronting on water not affected by the diversion of the Delaware; his "after" sales were sales of Delaware River properties, most notably the 1966 sale of the Van Loan property on the West Branch.

The City has moved after trial to strike plaintiffs' appraisals on the ground that Mr. Fellows relied on plaintiffs' Ex. 25 in making them. This motion is denied. Exhibit 25 was properly admitted on the trial for its factual content, which would have been properly relied on by Mr. Fellows in making his appraisals. There is no evidence that Mr. Fellows actually relied on opinions in Ex. 25 in preparing his reports. To the extent that his appraisals do reflect the opinions expressed in that report, they are, in the light of subsequent events, favorable to the City. Reliance on the opinions of others is not uncommon on the part of an expert witness, and is now expressly authorized by Rule 703, F.R.Evid.

Defendant's remaining objections to the Fellows' appraisals are equally without merit. It is of no significance that Fellows chose to call the date chosen for evaluation the "date of condemnation." The reality sought to be expressed, not the expression chosen, is the essential factor here, and Mr. Fellows, as discussed above, used the correct formula in estimating damages.

Finally, Mr. Fellows' concession that the prices of all these parcels had been rising at about 5% per year since the early 1970's is not inconsistent with his assertion that damage has occurred. Both parties agree, and this Court finds, that the highest and best use of these properties is for recreation. Damages are to be based on the highest and best use of the property before the trespass. *See, Snyder v. Pennsylvania*, 412 Pa. 15, 192 A.2d 650 (1963).

. . . [Specific Discussion of Damages Omitted]

As was observed by Judge Tenney (*supra*, p. 855), the standard for fixing damages for these plaintiffs is the same as the measure of damages being employed in proceedings by the City with respect to Damage Parcels on the other [New York] side of the River, opposite plaintiffs' properties. There, in proceedings under Title K of the Administrative Code of the City of New York, the City has condemned the riparian rights to the extent infringed upon by its dams. In reality, the proceedings here are, as Judge Tenney recognized, tantamount to condemnation. Accordingly the interest of justice in these cases demands that these plaintiffs, although proceeding technically on the theory of a permanent and continuous trespass or tort, should be treated as nearly as possible in all respects

equally with persons similarly situated owning riparian land on the New York side of the River. These latter persons receive interest on their awards from the date of "taking," at the rate of 6% per annum, notwithstanding the general limitation on interest imposed by the State of New York with respect to claims against municipal corporations (3%) found in § 3–a of the New York General Municipal Law. Prejudgment interest allowed under current economic conditions at an annual rate of less than 6% is a deprivation of property and an obvious injustice. Accordingly, Elwood's judgment, and the other judgments to be entered herein will bear pre-judgment interest at the rate of 6% per annum from the damage date until paid. *See generally, Hartman v. City of New York*, 29 Misc.2d 578, 218 N.Y.S.2d 404 (Sup.Ct. Sullivan Co. 1961).

In this case and with respect to the four other parcels, the Court will stay enforcement of judgment pending appellate finality, and pending also compliance with § 394a–2.0 of the Administrative Code of the City of New York. In addition, as a condition of payment, the City may require from Elwood and the other plaintiffs, releases or equivalent instruments in proper form which may be recorded in the land records of Wayne County, Pennsylvania so as to protect against any future claims, and give notice in the chain of title to persons hereafter acquiring any interest in the property.

*Conclusion*

The foregoing, together with the conclusions of law expressed in all prior decisions made in any of these consolidated actions to the extent not inconsistent herewith, taken together, constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52, F.R.Civ.P.

The Court is filing five separate judgments simultaneously herewith, each of which is stayed as hereinbefore set forth. Counsel for plaintiffs are directed to tax their costs before the Clerk within thirty (30) days, on not less than five (5) days notice, or upon waiver of notice.